UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE BOARD OF COUNTY COMMISSIONERS OF DOUGLAS COUNTY, KANSAS; STATE OF OKLAHOMA; STATE OF MONTANA; CITY OF BALTIMORE, MARYLAND; CITY OF PANAMA CITY, FLORIDA; ANOKA COUNTY, MINNESOTA; CITY OF COLUMBIA, SOUTH CAROLINA; and CITY OF GOLDSBORO, NORTH CAROLINA; on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> MCKESSON CORPORATION, <br><br> Defendant. | ) Case No. 1:08-cv-11349 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**PAGE**

I.     INTRODUCTION ...................................................................................................1

II.    JURISDICTION AND VENUE ............................................................................8

III.   PARTIES ...............................................................................................................9

IV.    STATEMENT OF FACTS ..................................................................................12

       A.    Drug Manufacturers and NDCs ...............................................................13

       B.    The Wholesale Acquisition Cost .............................................................14

       C.    The Average Sales Price ..........................................................................15

       D.    The Average Wholesale Price ..................................................................15

       E.    The WAC-to-AWP Spread .......................................................................16

       F.    Drug Wholesalers......................................................................................17

       G.    Wholesaler Sales Transactions ................................................................18

       H.    Retail Pharmacy Channel .........................................................................19

       I.    The Private End Payors for Prescription Drugs........................................20

       J.    End Payors' Drug Reimbursements are AWP-Based ...............................20

       K.    Medicaid Drug Reimbursements are AWP-Based as are Oklahoma's
             Payments ...................................................................................................22

       L.    Medicare Drug Reimbursements are AWP-Based ...................................24

       M.    PBMs.........................................................................................................25

       N.    U&C Payors ..............................................................................................27

       O.    The Brand Drug Pharmaceutical Market was Conducive to the Scheme ..............27

       P.    Private and Public End Payors Rely on Published Drug Pricing Compendia .......27

       Q.    The Emergence of First Data and Medi-Span as Electronic Data Publishers........29

       R.    The Merger of First Data and Medi-Span Systems ..................................31

       S.    First Data Gains the Trust of the Pharmaceutical Industry......................33

       T.    The Scheme Created Goodwill for McKesson with Its Retail Pharmacies ..........35

U.     By 2001, First Data WAC-to-AWP Mark-ups Were Susceptible to Abuse ..........35

V.     MCKESSON EXPLOITED FIRST DATA'S ALLEGED SURVEY PROCESS
       FOR ITS OWN PURPOSES ....................................................................................37

       A.     McKesson's Public Position Was That AWPs Were Determined by
              Manufacturers' Historic Mark-Ups and not by McKesson....................................37

       B.     Contrary to its Official Position, McKesson Raised its Internal Mark-Ups
              in an Effort to Increase AWPs .................................................................................39

       C.     McKesson Colluded With First Data to Increase Brand Drug Mark-Ups ............43

       D.     McKesson Sought to Conceal its Collaboration With First Data .........................56

       E.     McKesson Benefited From the Scheme....................................................................59

       F.     McKesson's Internal Documents Admit the Long-Term Effects of the
              Scheme .......................................................................................................................63

       G.     Evidence from Manufacturers Also Confirms the Existence of the Scheme
              and the Impact on the Market ...................................................................................66

       H.     The Other Major Wholesalers – Amerisource Bergen and Cardinal –
              Declined to Manipulate AWP or Participate in any Scheme With First Data .......69

              1.     While Cardinal and ABC faced the same pressures as McKesson to
                    increase profit margins for their pharmacy customers, they did not
                    manipulate AWP ..............................................................................................69

                    a.     Cardinal .................................................................................................69

                          (1)     Where possible, Cardinal set its "Reference Price"
                                 based on what manufacturers told Cardinal.....................69

                          (2)     Cardinal ensured that its AWP Reference Price would
                                 not be confused with FDB's AWPs ...................................70

                          (3)     Cardinal never responded to First Data "surveys"............70

                          (4)     Cardinal refused to respond to customer pressures
                                 to raise its mark-up............................................................73

                    b.     AmerisourceBergen ..............................................................................73

                          (1)     AmerisourceBergen based its AWPs on manufacturer
                                 information and, when that source dried up, on First
                                 Data's AWP ......................................................................73

                          (2)     ABC never responded to First Data "surveys" .................74

                          (3)     Despite pressure from its customers to raise its
                                 mark-up, ABC adhered to manufacturers' historic
                                 mark-ups ...........................................................................74

I.      Fraudulent Concealment and Continuing Violation ............................................74

VI.    CLASS ACTION ALLEGATIONS ................................................................78

VII.   CLAIMS FOR RELIEF ................................................................81

COUNT I CIVIL RICO (18 U.S.C. § 1962(c)) (On Behalf of Plaintiffs and the Class)..............81

A.      McKesson and First Data Formed an Association-in-Fact RICO Enterprise .......82

B.      McKesson Associated with the Enterprise ........................................83

C.      The Enterprise Affected Interstate Commerce ....................................85

D.      McKesson Conducted the Affairs of the Enterprise ................................88

E.      The Enterprise Engaged in a Pattern of Racketeering Activity, Consisting of Mail or Wire Fraud Violations ................................................89

        1.      The McKesson-FirstDataBank Enterprise engaged in a Scheme to defraud Public Payors ................................................91

        2.      McKesson specifically intended to defraud Public Payors ...............91

        3.      The Enterprise made use of the U.S. mails and interstate communications in furtherance of this Scheme ........................91

F.      Plaintiffs Relied on the Accuracy of the Falsely Inflated AWPs Published by First Data or Medi-Span........................................93

G.      Damages Caused by McKesson's Scheme ........................................94

COUNT II RICO CONSPIRACY (18 U.S.C. § 1962(d)) (On Behalf of Plaintiffs and the Class)........................................................95

A.      McKesson Knew and Adopted the Illegal Purpose of the Enterprise.................95

B.      McKesson Engaged in Activities to Further the Goals of the Enterprise ............96

C.      Damages Caused by McKesson's Scheme ........................................96

D.      McKesson is Jointly and Severally Liable for the Conduct of the Enterprise .......96

COUNT III VIOLATIONS OF UNFAIR AND DECEPTIVE TRADE PRACTICE LAWS (On Behalf of Plaintiffs and the Class)p ........................................97

COUNT IV CIVIL CONSPIRACY (On Behalf of Plaintiffs and the Class)............................101

COUNT V TORTIOUS INTERFERENCE WITH CONTRACT (On Behalf of the Proposed Class)........................................................102

COUNT VI USE OF DECEPTIVE TRADE PRACTICES IN VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT (15 OKL. ST. § 751, *et seq.*) (On Behalf of Plaintiff the State of Oklahoma) ........................103

COUNT VII VIOLATION OF OKLAHOMA MEDICAID FALSE CLAIMS ACT
(63 OKL. ST. § 5053, *et seq.*) (On Behalf of Plaintiff the State of Oklahoma) ..............104

COUNT VIII DECEPTIVE TRADE PRACTICES (VIOLATIONS OF MONT. CODE
ANN. §§ 30-14-101-1414) (On Behalf of Plaintiff the State of Montana) ....................105

COUNT IX MEDICAID FRAUD (VIOLATIONS OF MONT. CODE ANN.
§ 53-6-160) (On Behalf of Plaintiff the State of Montana) ...........................................106

COUNT X PUNITIVE DAMAGES (On Behalf of Plaintiff the State of Montana)..................107

PRAYER FOR RELIEF ..........................................................................................................108

Plaintiffs the Board of County Commissioners of Douglas County, Kansas; the State of Oklahoma, *ex rel.* W.A. Drew Edmondson, in his capacity as Attorney General of the State of Oklahoma; the State of Montana, *ex rel.* Steve Bullock, in his capacity as Attorney General of the State of Montana; the City of Baltimore, Maryland; the City of Panama City, Florida; Anoka County, Minnesota; the City of Columbia, South Carolina; and the City of Goldsboro, North Carolina (collectively "Plaintiffs" or "Public Payors"), by and through counsel, upon personal knowledge as to their own acts and beliefs, and upon information and belief as to all matters based upon the investigation of counsel, allege as follows:

## I.    INTRODUCTION

1.    Plaintiffs are State and local governmental entities which, during the relevant time period, paid for brand-name prescription drugs based on a formula tied to the average wholesale price ("AWP") of such drugs.

2.    Plaintiffs bring this case against McKesson Corporation ("Defendant" or "McKesson") on behalf of themselves and a class of governmental entities as further defined herein ("Class" or "Public Payor Class") to recover hundreds of millions of dollars in damages caused by Defendant's fraudulent scheme to inflate the amount Plaintiffs and the Class paid for hundreds of brand-name prescription drugs.

3.    As described herein, Defendant's scheme violated the federal racketeering laws, 18 U.S.C. § 1962(c)-(d), the unfair and deceptive trade practices laws of numerous states, and the common law.

4.    McKesson and its officers or employees associated itself with First DataBank, Inc. ("First Data" or "FDB") and its officers or employees to form a RICO association-in-fact and engage in a pattern of racketeering activity including multiple episodes of mail and wire fraud, all designed to increase the AWP for brand-name drugs.  McKesson and its

co-conspirators engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy to violate RICO. Plaintiffs were injured as a result of the deceptive practices undertaken by the RICO association-in-fact and seek to obtain treble damages and other injunctive and equitable relief against McKesson for payments made for prescriptions of brand-name drugs.

5.      Plaintiffs provide prescription drug benefits through self-insured health programs.

6.      McKesson's deceptive practices and unlawful acts involved a scheme and course of conduct that directly resulted in the transmission and publication of false and misleading information concerning AWPs (the "Scheme"). These deceptions resulted in injuries to Plaintiffs, which were and will continue to be forced to bear millions of dollars of excess charges arising from the Scheme and the fraudulent AWPs.

7.      The exact identity of the drugs covered by this lawsuit is capable of being discovered from the records of First Data. Based on an investigation of First Data's databases, the list of such drugs is attached as Exhibit A (the "Marked Up Drugs").

8.      In the pharmaceutical marketplace, those in the retail distribution chain – national chain drug pharmacies, independent pharmacies, mail order houses and other retailers – purchase drugs on the basis of the published wholesale acquisition cost or "WAC," a benchmark price established by manufacturers and used by them and wholesalers to establish prices to retailers. Although retailers **buy** pharmaceuticals on the basis of WAC, they **get paid** (*i.e.*, get reimbursed) for branded drugs based on a different benchmark, ***the average wholesale price or "AWP."*** As the difference between AWP and WAC increases,

the larger "spread" affords retailers and other middlemen like pharmaceutical benefit managers ("PBMs") opportunities for larger profits.

9.      Each year more than three billion prescriptions are written in the United States. The various actors in the marketplace must have a way of determining what the AWP is at any moment in time for the approximate 65,000 drugs used in the marketplace.  AWPs are, therefore, compiled and published by publishing companies, including First Data and Medi-Span.  Through these compilations, which are available in both hard copy and electronic form, those in the distribution chain can determine the AWP for any given drug and effectuate reimbursement accordingly.

10.     Consumers, health and welfare plans, health insurers and governmental entities, including state Medicaid programs and other governmental entities ("Payors"), who pay for prescription drugs use and rely on AWP in doing so.  Virtually all these entities had contracts for the brand-name drugs at issue that use AWP as a pricing standard.

11.     First Data, McKesson, and pharmaceutical companies know that governmental and public payors utilize AWP as a pricing benchmark.

12.     Until March 15, 2005, First Data represented to those in the pharmaceutical market that it derived the WAC mark-up that establishes the AWP either from manufacturers or by conducting "a survey" of wholesalers whose purpose was to verify prices reported by the manufacturer.  First Data further represented that AWP represents the "average of prices charged by the national drug wholesalers," and that the number of surveys it was conducting to determine the published AWP was "increasing."  McKesson is one of the wholesalers that was purportedly "surveyed" by First Data as part of this process.

- 3 -

13.     Historically, in order to arrive at the AWP for branded drugs, manufacturers applied a mark-up of 20% or 25% to WAC.  Whatever mark-up was given to a particular branded drug "stuck" with that drug indefinitely.  Until 2002, there was variation, supposedly based on manufacturer direction or on First Data's wholesale surveys, in the WAC to AWP mark-up for hundreds of brand-name drugs.  For example, manufacturer A might have a mark-up of 20%, while manufacturer B might utilize a mark-up of 25%.

14.     In late 2001, First Data and McKesson reached a secret agreement on how the WAC to AWP mark-up would be established for hundreds of brand-name drugs.  The two companies agreed to artificially raise and fix the AWP on brand-name drugs and therefore artificially raise prices in that market.  As part of this agreement, First Data, to the extent it received information from others besides McKesson, used the WAC-to-AWP mark-up provided only by McKesson as the basis for its published AWP and did not "survey" any other wholesalers.  To the extent FDB did receive material from other wholesalers, such material was not the basis for the FDB-published AWP, only McKesson's information was.  McKesson knew that FDB was using its pricing as the basis for setting the mark-up over WAC.  Sometimes, within a day or less of requesting a price change or mark-up from McKesson, FDB responded by increasing the mark-up.

15.     As part of their agreement and conspiracy, McKesson and First Data, without any legitimate economic justification, raised the WAC-to-AWP mark-up to 25% for over four hundred brand-name drugs that previously had received only the 20% mark-up amount.  To conceal the Scheme, McKesson and First Data agreed to typically effectuate price changes only when some other WAC-based price announcement was made by a drug manufacturer.  This camouflaged both the associated increase in the WAC-to-AWP mark-up and WAC-to-

- 4 -

AWP spread and McKesson as the source of the increased mark-up.  McKesson communicated these new WAC-to-AWP mark-ups to First Data.  First Data, without regard to any change in the actual average wholesale prices occurring in the pharmaceutical marketplace, and without reference to the manufacturers' suggested AWPs (or WACs) for these drugs, and without surveying other wholesalers, then published new AWPs with the new WAC-to-AWP mark-up.  First Data did so despite receipt of information, in some instances, directly from manufacturers specifying or suggesting a 20% mark-up as appropriate.  On some occasions, some of the manufacturers discretely questioned this increase, but First Data refused to change the published AWP and the manufacturers failed to take any action to remedy First Data's unjustified raise in AWP.

16.    The dramatic nature of the Spread Scheme is illustrated by the following chart depicting the hundreds of drugs whose WAC-to-AWP mark-up was raised as part of the Scheme.  The spike in 2002 reflects implementation of the Spread Scheme:





**Note**: "NDC" means National Drug Code and refers to a number assigned to each drug.

17.    Once McKesson and First Data raised the WAC-to-AWP mark-up to 25% on a given drug, that mark-up remained in place and still remains in place to this day, and thus continues to injure those entities that rely on AWP as a pricing standard.

18.    McKesson had an economic incentive for implementing the Scheme. A major part of McKesson's business comes from large pharmaceutical retail chains and other retail pharmaceutical clients. McKesson implemented this Scheme in order to provide a benefit to those important retail pharmacy clients. Pharmacies are reimbursed by Plaintiffs based on AWP. Consequently, pharmacies make a profit on the spread between AWP and their acquisition cost for a drug. Under this system, a higher WAC-to-AWP mark-up results in increased profits to pharmacies. Thus, an increase in the WAC-to-AWP mark-up results in larger profits for retailers.

19.    McKesson was proud of its efforts and discretely boasted to select retail clients that McKesson "had been working on AWP expansion with some success."[1]  Internally McKesson noted that clients were "very glad that McKesson was doing this."[2]  Confirming the secrecy of the Scheme, McKesson cautioned that its "AWP expansion effort" and information about McKesson's role in inflating AWP is "not intended to be handed out to customers" but could be described to show "McKesson is doing our part."[3]  "AWP expansion" was a McKesson euphemism for the WAC-to-AWP price fix.

20.    First Data agreed to this Scheme to ease the burden of having to establish accurate spreads and to maintain the demand for its business among entities in the pharmaceutical distribution chain whose reimbursement is based on AWP, even though First Data knew that it no longer had the industry contacts and cooperation necessary to ensure the publication of accurate pricing.  Thus, First Data and McKesson shared multiple common purposes, though they may have had different reasons for doing so, and each acted to achieve those purposes by implementation of the 5% Scheme.

21.    Plaintiffs' payments for pharmaceuticals were tied to published AWPs.

22.    As a result of this artificial increase in the mark-up of the WAC from 20% to 25%, Plaintiffs' drug prices were increased.

23.    Among the drugs whose prices are artificially inflated by the Scheme are some of the top brand-name drugs used by hundreds of millions of Americans, such as:  Allegra (a leading allergy drug), Azmacort (a leading asthma drug), Celebrex (a leading arthritis/pain medicine), Coumadin (a leading anticoagulant), Flonase (a leading asthma drug), Lipitor (the

---

[1] MCKAWP 0069726.
[2] MCKAWP 0069726.
[3] MCKAWP 0069732.

world's top selling drug, a statin), Neurontin (a leading pain medication), Nexium (a leading

reflux drug), Prevacid (a leading ulcer/reflux drug) and Valium.  Given the billions of dollars

spent on prescription drugs annually, a 5% increase in the WAC-to-AWP mark-up results in a

substantial increase in payments for pharmaceuticals.  For example, AstraZeneca's Nexium

had annual sales in 2004 of almost $4 billion.  A bump of 5% in the WAC-to-AWP mark-up

results in an increase of over $100 million per year in reimbursements for just one drug.

Another such drug is Pfizer's Lipitor, whose annual sales in 2004 exceeded $10 billion.  As a

result of the 5% increase imposed by First Data and McKesson, hundreds of millions per year

was spent on Lipitor that would not have been absent the Scheme.

24.     In this action, Plaintiffs seek to recover damages incurred and/or restitution

resulting from McKesson's unlawful acts and practices, as well as appropriate equitable

and/or injunctive relief, civil penalties, costs of litigation including attorneys' fees, and all

other relief authorized by law.  Plaintiffs assert, *inter alia*, claims for violations of RICO, 18

U.S.C. § 1962(c) and (d), the unfair and deceptive trade practices laws of numerous states,

and the common law.

25.     McKesson knew Plaintiffs would be injured to the extent they were forced to

provide, pay, and/or reimburse for prescription drug expenditures at inflated prices.  Plaintiffs

seek restitution for the damages incurred in purchasing or reimbursing for prescriptions as a

result of the Scheme.

## II.      JURISDICTION AND VENUE

26.     Subject-matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331

because Plaintiffs assert federal causes of action and 18 U.S.C. § 1964 because a violation of

the RICO statute is asserted.

27.     Subject matter over the state law claims is proper in this Court pursuant to 28 U.S.C. § 1367(a) because such claims are so related to claims in this action within the Court's original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

28.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and (c) because McKesson as a corporation is "deemed to reside in any judicial district in which [it is] subject to personal jurisdiction" and because the misrepresentation and material omissions "giving rise to claim[s] occurred" in this District as well as throughout the Commonwealth of Massachusetts.  Venue is also proper in this District pursuant to RICO's special venue provision, 18 U.S.C. § 1965, and the Clayton Act § 12, 15 U.S.C. § 22 because McKesson transacts business throughout the State of Massachusetts.  Further, this District is also the location of cases asserting similar claims against McKesson.  *See New England Carpenters Health Benefits Fund v. First Databank, Inc. and McKesson Corporation*, Civil Action No. 05-11148-PBS (D. Mass.).

## III.    PARTIES

29.     Plaintiff Douglas County, Kansas ("Douglas County") is a county located in northeastern Kansas with a population of approximately 114,000.  Douglas County is a governmental entity and pays for brand-name prescription drugs based on a formula tied to the AWP of such drugs through its self-insured health insurance program which provides prescription drug benefits to over 500 current and former employees.  As described below, Defendant fraudulently manipulated the AWP to increase the amount Douglas County paid retail pharmacies and/or other providers of brand-name prescription drugs on behalf of covered individuals.

- 9 -

30.     Plaintiff State of Oklahoma ("Oklahoma") is a governmental entity and pays for brand-name prescription drugs based on a formula tied to the AWP of such drugs through Oklahoma's Medicaid program ("SoonerCare") and the Oklahoma State & Education Employees Group Insurance Board (the "Group Insurance Board").  The State of Oklahoma brings this action as a named plaintiff on behalf of SoonerCare and the Group Insurance Board.  As described below, Defendant fraudulently manipulated the AWP to increase the amount SoonerCare and the Group Insurance Board paid retail pharmacies and/or other providers of brand-name prescription drugs on behalf of covered individuals.

31.     Plaintiff State of Montana ("Montana") is a governmental entity and pays for brand-name prescription drugs based on a formula tied to the AWP through Montana's Medicaid program ("Montana Medicaid").  Montana brings this action as a named plaintiff on behalf of Montana Medicaid.  As described below, Defendant fraudulently manipulated the AWP to increase the amount Montana Medicaid paid retail pharmacies and/or other providers of brand-name prescription drugs on behalf of covered individuals.

32.     Plaintiff City of Baltimore, Maryland ("Baltimore") is the largest city in the State of Maryland.  The City of Baltimore is a governmental entity and pays for brand-name prescription drugs based on a formula tied to the AWP of such drugs through its self-insured coverage of health benefits for its employees and retirees.  As described below, Defendant fraudulently manipulated the AWP to increase the amount Baltimore paid retail pharmacies and/or other providers of brand-name prescription drugs on behalf of covered individuals.

33.     Plaintiff City of Panama City, Florida ("Panama City") is a municipality located in the Florida panhandle with a population of approximately 36,807.  Panama City is a governmental entity and pays for brand-name prescription drugs based on a formula tied to

the AWP of such drugs through its self-insured coverage of health benefits for its employees and retirees. As described below, Defendant fraudulently manipulated the AWP to increase the amount Panama City paid retail pharmacies and/or other providers of brand-name prescription drugs on behalf of covered individuals.

34.     Plaintiff Anoka County, Minnesota ("Anoka County") is a political division of the State of Minnesota with a population of approximately 327,005. Anoka County is a governmental entity and pays for brand-name prescription drugs based on a formula tied to the AWP of such drugs. As described below, Defendant fraudulently manipulated the AWP to increase the amount Anoka County paid retail pharmacies and/or other providers for brand-name prescription drugs on behalf of covered individuals.

35.     Plaintiff City of Columbia, South Carolina ("Columbia") is the state capital and the largest city in the State of South Carolina. Columbia is a governmental entity and pays for brand-name prescription drugs based on a formula tied to the AWP of such drugs through its self-insured coverage of health benefits for its employees and retirees. As described below, Defendant fraudulently manipulated the AWP to increase the amount Columbia paid retail pharmacies and/or other providers of brand-name prescription drugs on behalf of covered individuals.

36.     Plaintiff City of Goldsboro, North Carolina ("Goldsboro") is located in Eastern North Carolina and is the county seat for Wayne County, North Carolina. Goldsboro is a governmental entity and pays for brand-name prescription drugs based on a formula tied to the AWP of such drugs through its self-insured coverage of health benefits for its employees and retirees. As described below, Defendant fraudulently manipulated the AWP to increase the

001821-16 288655 V1

amount Goldsboro paid retail pharmacies and/or other providers of brand-name prescription drugs on behalf of covered individuals.

37.     Defendant McKesson Corporation is a Delaware corporation with its principal place of business at McKesson Plaza, One Post Street, San Francisco, California 94101. McKesson claims to be the leading provider of supply, information and care management products and services designed to reduce costs and improve quality across healthcare.  Founded in 1833, with annual revenues of more than $50 billion, McKesson ranks as the 18th largest industrial company in the United States.

38.     McKesson's unnamed co-conspirator is First DataBank, Inc. ("First Data" or "FDB"), a Missouri corporation with its principal place of business at 1111 Bayhill Drive, San Bruno, California 94066.  First Data is a subsidiary of the Hearst Corporation and is the leading provider of electronic drug information to the healthcare industry.  For the period of 1998 through about January 2002, when it agreed to divest, Hearst Corporation jointly operated First Data and the only competitor in the electronic drug pricing market, Medi-Span.  As part of the divestiture agreement, First Data provided its drug price information to Medi-Span until approximately October 2004.

## IV.    STATEMENT OF FACTS

39.     This case involves the artificial increase in the "mark-up" factor between the so-called wholesale acquisition cost (or "WAC") and the so-called average wholesale price (or "AWP") of a large number of brand-name prescription drugs, a scheme first implemented in late 2001 by McKesson (the largest U.S. pharmaceutical wholesaler) and First Data (the nation's most widely used and "trusted" electronic drug data publisher).

001821-16 288655 V1

A.      **Drug Manufacturers and NDCs**

40.      Drug makers manufacture brand-name and generic drugs.  Generally, a drug product that is covered by a patent and thus is manufactured and sold exclusively by one firm is a brand-name drug.  After the patent expires, multiple companies can produce the same drug product in the same manner, but the name of the brand-name drug itself remains with the original manufacturer.  Drug products not covered by patent protection and produced and/or distributed by many firms are referred to as generic drugs.  Manufacturers tend to be either brand-name drug manufacturers or generic drug manufacturers, although some manufacture both types of drugs.

41.      There are approximately 65,000 branded and generic drug products in the United States market, including different dosages of the same drug.  Prescription drugs are dispensed to patients primarily through four different drug distribution channels:  (a) retail pharmacies (including national chain pharmacies, independent pharmacies, supermarket chains, and mail order pharmacies); (b) physicians who administer the drug in an office; (c) home infusion (*i.e.*, drugs administered into the patient's bloodstream); and (d) other medical providers.  This lawsuit primarily involves branded drugs distributed through the first channel, the retail pharmacies.

42.      All drugs intended for retail pharmacy sale are identified by an eleven-digit National Drug Code ("NDC") that is listed with the United States Food and Drug Administration ("FDA").  The NDC is used to identify the drug delivered to the patient.  The first five digits of the NDC show the identity of the company that manufactured and/or packaged the drug, the middle four digits identify the drug ingredient and dosage, and the last two digits identify the package size (*e.g.*, whether the bottle of pills contained 100 or 1,000 pills).  While there are currently about 65,000 active NDCs, many more NDCs have been issued over time (over the years many drugs and associated NDCs have been phased out).

- 13 -

**B.      The Wholesale Acquisition Cost**

43.      Branded manufacturers arrive at an original launch price by taking into account research and development costs, launch and marketing costs, competitor prices and estimates of consumer and physician demand.  Generic makers, of course, generally use commodity pricing approaches.  Once an introductory price has been set, the branded manufacturer establishes the wholesale acquisition cost, or "WAC," which is used as a baseline for sales to wholesalers (subject to many adjustments, as will be seen).  The WAC for branded drugs is then published by the manufacturer.

44.      Manufacturers establish the WAC as a baseline for sales to wholesalers and others in the distribution chain.  Thus, while WAC may not represent ***actual*** acquisition cost (as wholesalers may obtain discounts through volume purchases or special deals, and as wholesalers' customers who also buy based on WAC may receive other price concessions charged back to the manufacturers), it is the baseline for branded drug sales by manufacturers to national wholesalers.  In addition, WAC is a publicly available price for most branded drugs.  It is the closest reported price to the actual transaction price between a manufacturer and the wholesaler or other direct purchaser of a drug product.  Because the wholesalers' price to the retail class of trade is also typically based on, or is a function of, the WAC, a change in WAC generally results in a similar percent change in price to both wholesalers and to retail pharmacies.

45.      WACs are typically reported on invoices between the manufacturer and the drug wholesaler (and between the wholesaler and the retailer, or between the manufacturer direct to the retailer).  Some drug manufacturers have other names for the WAC price such as manufacturer list price, catalog price, direct price, wholesale net price, or book price.

C.    **The Average Sales Price**

46.    After all price concessions are considered, a drug manufacturer achieves a net

sales price, *i.e.*, a transaction price paid by a pharmacy or provider when purchasing a drug

product from either a drug manufacturer or wholesaler.  The net sales price takes into account the

invoice price and all on-invoice, as well as off-invoice adjustments for discounts, rebates,

purchasing allowances, or other forms of economic consideration.

47.    Of course, manufacturers can (and do) calculate for internal purposes the net sales

price at which they are able to sell their products.  The average of those net sales prices is usually

called the average sales price (or "ASP").  While net acquisition prices and associated ASPs are

known to each drug manufacturer, they are not typically published or made public.  Some drug

manufacturers may have a variety of terms for specific discounts that are based on class of trade,

volume of purchase, market share movement, preferred formulary status, terms of payment, and

other criteria.  Because ASP is meant to be the net price after all forms of discounts, rebates,

purchasing allowances or any other forms of economic consideration have been taken into

account, discounts that contribute to ASP are considered proprietary and confidential by drug

manufacturers.  As a result, for retail pharmaceutical products the exact relationship of ASP to

WAC (or to the average wholesale price or AWP, discussed below) for a particular drug at a

particular point in time is not publicly known.

D.    **The Average Wholesale Price**

48.    In addition to causing to be published a wholesale acquisition cost or WAC for

branded drugs, over the years branded (and generic) manufacturers have also caused to be

published an average wholesale price (or "AWP") for prescription pharmaceuticals.  The average

wholesale price or AWP is a list price used for invoices between drug wholesalers and

pharmacies (or other appropriate drug dispensers, such as doctors for physician-administered

drugs) and is typically used as a benchmark for the reimbursement by end payors to dispensers (such as retail pharmacies or doctors) for drugs provided to patients. Historically, the AWP is set directly or indirectly by the drug manufacturer, with an effective date and remains in effect until a change in price is published.

49.     WAC and AWP differ in that they represent list prices at different levels in the market. WAC represents a list price from manufacturer to wholesaler, while AWP represents a list price from wholesaler to dispenser (*e.g.*, pharmacy, physician, hospital, or other provider).

**E.    The WAC-to-AWP Spread**

50.     In the pharmaceutical industry, the percentage by which the AWP exceeds the WAC is sometimes known as the "mark-up" for a particular drug product.

51.     The amount of the AWP that represents the mark-up is known as the "spread." For example, a drug with a 24% mark-up (for instance from a WAC of $100 to an AWP of $125) has a spread ($25 of the $125 AWP) of 20%.

52.     For many years preceding the Scheme alleged in this Complaint, the WAC-to-AWP mark-up for branded drugs had predictably-set patterns, and the competitive pricing marketplace for pharmaceuticals had adjusted and accommodated for those patterns. For branded pharmaceuticals, the WAC/AWP mark-up tended to fall in two quantum places:  20%, and 25%. In other words, in the many years preceding the Scheme alleged in this case, a particular branded drug NDC would carry both a published WAC (*e.g.*, $100 for a 100 count bottle) and a published AWP at either 1.20 or 1.25 of the WAC (*e.g.*, $120 or $125).

53.     These standard 20% and 25% WAC/AWP mark-up factors were commonly associated by McKesson, First Data, and others in the pharmaceutical industry with particular divisions of pharmaceutical companies. For example, a pharmaceutical division might be

- 16 -

designated as a "20% mark-up" company, while another company would be designated as a "25% mark-up" company.

54.     Another predictable aspect of brand drug prices over the years was the *unchanging* nature of the WAC/AWP mark-up for a particular NDC.  In other words, if a particular NDC first launched at a 20% mark-up value, that NDC would remain as a 20% drug during the lifetime of that NDC, almost as if it were part of the genetic code for that NDC.  Thus, the WAC and AWP for that drug moved in parallel fashion (usually up), keeping the same mark-up factor associated with that NDC.  ***Indeed, prior to the Scheme alleged in this case, it was extraordinarily rare for the WAC/AWP mark-up to be changed for any particular NDC***.

**F.     Drug Wholesalers**

55.     Branded manufacturers' primary customers are wholesalers, although to a much broader extent, manufacturers also sell directly to retail pharmacy chains, mail-order pharmacies, hospital chains and some health plans.  Wholesalers are manufacturers' largest group of purchasers, and wholesale prices depend partially on volume purchased.

56.     Like most other types of wholesalers, pharmaceutical wholesalers purchase goods from manufacturers and then resell them to other purchasers.  Wholesalers, whose main customers are retail and mail-order pharmacies, buy pharmaceuticals in large quantities, sort them by customer needs and disperse them in usable quantities.

57.     The price wholesalers pay to manufacturers for any given product at any given time can fluctuate with the quantity purchased.  The manufacturer may quote a wholesaler a price close to or at WAC, however, there is often a small volume discount or early cash payment discount off that price.

58.     National wholesalers are the primary intermediate level in the distribution process retail channel.  They account for 45.7% of prescription drugs ($98.5 billion) in 2002.  Other

intermediate channels of distribution include chain warehouses with 32.3% ($69.8 billion) of the market, regional and specialty wholesalers with 9.3% ($20.2 billion) of the market, and group purchasing organizations that usually contract with a wholesaler to perform the distribution function on their behalf. Only about 12% of prescription sales by drug manufacturers are made directly to providers (*e.g.*, physicians or hospitals) or pharmacies.

59.     Wholesale drug distribution is heavily concentrated. The three largest wholesalers are Defendant McKesson, Cardinal Health, Inc. ("Cardinal") and AmeriSource Bergen Corporation ("ABC"). Each of these "Big Three" wholesalers has slightly less than one-third of the national market of prescription drug wholesale distribution. Collectively, they account for more than 80% of drug sales that flow through drug wholesalers (national, regional, and specialty).

**G.     Wholesaler Sales Transactions**

60.     National drug wholesaling is generally perceived as price competitive, with McKesson, Cardinal and ABC (or their predecessors) competing for business with retailers (primarily major chain drug retailers, independent pharmacies, supermarket drug retailers, and mail order businesses). As a result, drug wholesaler margins to retailers tend to be thin (even at times non-existent), with a significant portion of national drug wholesaler revenue instead being derived from prompt pay discounts received from manufacturers and from wholesaler inventorying measures that anticipate price increases.

61.     National drug wholesalers sell branded drugs to the retail class of trade based on prices pegged to the WAC. Given the tendency for narrow margins in the national drug wholesaling business, the published WAC for a manufacturer's retail-channel branded drug is not only a strong market indicator for the wholesaler's buy-side cost for a branded drug, it is also

expected that the WAC, subject to certain adjustments, is a reasonable benchmark of the sell-side costs charged by national wholesalers of branded drugs to major pharmacy retailers.

**H.     Retail Pharmacy Channel**

62.     The retail pharmacy channel (including chain drug store companies, independent pharmacies, mail orders and supermarkets), comprise roughly two-thirds of the estimated market share of dollars for prescription drugs.  Currently, the four largest drug store chains account for most of the retail pharmacy market share today, and the recent consolidation trend appears to be continuing.  Some large national or regional retail chains (including pharmacy, supermarket, mass-merchandiser chains) purchase drugs in large enough volumes so that they can bypass the wholesaler and buy directly from the manufacturer, but these direct purchases remain a small portion of the overall picture.

63.     Regardless of whether the retail pharmacy is large or small, its purchase of prescription drugs is typically based using WAC as a benchmark, although that benchmark is subject to adjustments such as a variety of discounts, rebates, and direct or indirect offsets to pricing.

64.     When large chain pharmacies buy directly from manufacturers, manufacturers offer these pharmacies both up-front discounts for purchasing their products and back-end discounts and formulary rebates for selling specific volumes of drugs or achieving a certain share of a specified market.  When purchasing drugs directly from manufacturers, pricing uses the same WAC benchmark system, but the actual transaction cost varies considerably from the WAC given these other arrangements.

65.     Smaller retail entities, such as independent retail pharmacies and regional retail chains, purchase directly from wholesalers or joint group purchasing organizations ("GPOs") in order to leverage their combined purchasing power.  Some of these groups further reduce their

costs through direct rebate deals offered by manufacturers.  In making purchases from wholesalers, resellers and manufacturers, the starting benchmark for transactions is the WAC, but, again, the actual transaction cost is highly variable due to the additional arrangements.

66.    In short, entities in the retail distribution chain (including wholesalers, resellers (retailers), retail chain pharmacies, independent pharmacies, mail order houses, and GPOs) purchase brand-name drugs based upon WAC.  While the actual transaction purchase price varies from the WAC, WAC acts as the actual baseline for the many millions of transactions by which entities in the retail distribution chain acquire branded drugs.

**I.    The Private End Payors for Prescription Drugs**

67.    At the most basic level, prescription drug expenditures are funded by either private or public sources.  In the United States, more than $200 billion dollars is spent annually on prescription drugs.  About three quarters of this amount is privately funded.

68.    Private payors for prescription drugs include drug benefit plan sponsors and consumers.  The drug benefit plan sponsors (who pay for part or all of the cost of prescription drugs for their covered beneficiaries) include self-insured employers, health and welfare plans, health insurers and managed care organizations ("MCOs").  Most of these plan sponsors reimburse retailers (for retailers' drug purchase costs) through pharmacy benefit administrators (either health plans or pharmacy benefit management companies) who negotiate discounts with retail pharmacies and rebates from drug manufacturers.  The vast majority of such purchases are for out-patient drugs that are self-administered, *i.e.*, drugs distributed through the retail distribution channel.

**J.    End Payors' Drug Reimbursements are AWP-Based**

69.    Although retail pharmacies ***purchase*** pharmaceutical products based upon pricing formulae that employ the WAC, retail pharmacies ***get paid*** (*i.e.*, receive reimbursement) from

plan sponsors and consumers based upon an AWP reimbursement formula plus a dispensing fee. This is a fundamental anomaly of the retail distribution channel for drug products – that retail pharmacies' **purchases** are based on prices pegged to the published WAC, but retail pharmacies' **reimbursements** or charges are based on the published AWP.

70.    Health plans typically contract with intermediaries called pharmacy benefit managers ("PBMs") to negotiate prices with manufacturers and retail pharmacies and thereafter adjudicate the numerous transactions that occur during the administration of a plan.  Although the PBM negotiates prices and adjudicates claims, the plan sponsor (*i.e.*, insurer, self-insured employee, health and welfare plan) remains at risk for the charges paid to retail pharmacies and mail orders.  In the contracts between PBMs and plan sponsors, the retail pharmacies' drug ingredient costs for brand-name drugs are reimbursed at the AWP less a certain percentage, or "discount."

71.    Brand drug reimbursement for retail pharmacy ingredient cost contained in the contracts between PBMs and plan sponsors, and PBMs to pharmacies, use an AWP-based reimbursement structure.  For example, since 2002, Express Scripts' standard form contract has expressly stated that its reimbursement formula is based on AWP from the "current information provided to ESI by drug pricing services such as First Data Bank. . . ."  Similarly, Caremark's website states:  "For both brand and generic drugs, the pricing formula at retail and mail is based on the discounted Average Wholesale Price (AWP) as reported by First Data.  Caremark loads First Data's updated data into the system on a daily basis."  Other PBMs expressly utilize First Data's published AWPs as the source of AWP pricing to be utilized in payment.

72.    The AWP-based reimbursement benchmark for private payments to the retail class of pharmaceutical trade has long been acknowledged.  Most recently, at a hearing on

- 21 -

December 7, 2004, before the United States House of Representatives Committee on Energy and

Commerce, a former Senior Vice President of Aventis Pharmaceuticals, testified that "AWP has

been codified as the benchmark price, by statute and regulations, in the public sector and by

contract in the private sector." Those paying for drugs, by statute or contract rely on and use the

published AWP.

73. Third-Party AWP-based reimbursement has also been acknowledged by

McKesson. For example, in September 2001, Robert James of McKesson internally noted that "I

think it is important to understand that the AWPs that are used for third party reimbursement are

the First Data Bank ("FDB") AWPs."[4]

74. In summary, thousands of pharmaceutical reimbursement contracts are based on

AWP minus a specified discount. As a result, a leading expert on pharmaceutical pricing has

concluded that "AWP is the glue that binds the system of pharmaceutical reimbursement rates.

All or predominantly all, reimbursement rates for pharmaceuticals purchased under public sector

and private drug benefit insurance plans are negotiated based upon AWP and discounts from

AWP." Public and private payor reliance on AWP was well known to McKesson.

**K.    Medicaid Drug Reimbursements are AWP-Based as are Oklahoma's Payments**

75. Public purchases for prescription drugs provide a variety of programs for low-

income and elderly patients, veterans, members of armed services, and federal, state and local

government employees. These public payors also rely on and use AWP as a basis for

reimbursement to pay for dispensers' ingredient costs for branded pharmaceutical products.

76. Medicaid has the most significant impact on prescription drug pricing for out-

patient drugs. The Medicaid Program, jointly financed through federal and state funds, is

---

[4] MCKAWP 0068514.

designed to aid certain low-income people and the disabled, and covers about 40 million

individuals.  Between 1997 and 2002, Medicaid expenditures for prescription drugs in the fee-

for-service part of the program increased at an average annual rate of 18%, going from

$10.2 billion to $23.4 billion.  (While these are significant sums, they amount to less than 10% of

the overall annual prescription drug expenditure.)

77.    Medicaid's reimbursement system relies upon the published list prices of drugs

(which are largely directly set by manufacturers) to determine pharmacies' reimbursement.

States reimburse pharmacies using formulas that are typically based on the average wholesale

price or AWP of a drug.  For example, a state might reimburse a pharmacy 85% to 90% of the

average wholesale price of a drug plus a fixed dollar amount of $3 to $5 (as dispensing fee) to

cover the pharmacy's other costs.

78.    Plaintiffs routinely provide prescription drug coverage as part of their self-insured

programs.  Included in that coverage are payments for drug products, including both single

source drug products (brand-name drugs) and multi-source drug products (generally generic

drugs), that are delivered to the patient either by providers (including pharmacies) or physicians

(incident to their services.)

79.    Plaintiffs' programs' reimbursement rates at all times relevant to this Complaint

have been based on price data as published by FDB or other price reporting services.

80.    During all relevant times covered by the Complaint:

a.    Plaintiffs' programs have relied on FDB or Medi-Span as their primary

source of pricing data and has utilized reports of AWP, direct price ("DP"), and the

Federal Upper Limit ("FUL") supplied by FDB or Medi-Span.

b.    FDB reported AWPs, DPs, wholesale acquisition costs ("WACs") and FULs for the specific prescription drugs based on the price information provided by McKesson for the respective drugs.

c.    Medi-Span reported AWPs, DPs, wholesale acquisition costs ("WACs") and FULs for the specific prescription drugs based on the price information provided by FDB for the respective drugs.

81.    McKesson caused to be reported false or misleading prices to Plaintiffs' programs by providing false or misleading price information to FDB with knowledge that they in turn would utilize such false and misleading price information in determining the AWPs that were reported to Plaintiffs.

**L.    Medicare Drug Reimbursements are AWP-Based**

82.    The other significant public purchaser for prescription drugs is the federal Medicare Program.

83.    Until recently, the Medicare Program generally did not cover the cost of out-patient prescription drugs that a Medicare beneficiary self administers (*e.g.*, by swallowing the drug in liquid or pill form).  However, Medicare Part B does cover approximately 450 drugs, including injectables administered directly by a doctor, certain oral anti-cancer drugs, and drugs furnished under a durable medical equipment benefit.

84.    Medicare Part B reimburses medical providers 80% of the allowable amount for a drug.  The remaining 20% "co-payment" amount is paid by the Medicare Part B beneficiary.  All medical providers are required by law to bill the 20% co-payment and make attempts beyond merely billing to collect that amount.  Moreover, before Part B benefits are payable, beneficiaries under Part B are required to pay an annual deductible amount.

85.     Some Medicare beneficiaries can purchase private Medigap insurance, which covers, among other things, all or part of the 20% co-payment for Covered Drugs.

86.     Beginning in 1998, Medicare's practice of reimbursing based upon the published AWP was codified by statute and implemented by regulation.  Beginning in 1998 and until recently, Medicare reimbursed for drugs and biologicals under its program of the reimbursing physician-administered drugs based upon 95% of the published average wholesale price.

87.     At the end of 2003, Congress enacted the Medicare Modernization Act.  Among other things, the Act changed the AWP-based reimbursement system for Medicare to a system based upon each manufacturer's actual calculation for the average sales price for each drug or biological covered by the program.  Interim rules transitioned the AWP-based system with modifications to the percentage off of AWP.  Beginning in 2004, Medicare has been transitioning to an ASP-based reimbursement system.

88.     In summary, the two largest public purchaser programs for prescription pharmaceuticals – Medicaid and Medicare – historically relied upon published average wholesale prices as the fundamental basis upon which to reimburse for branded drug ingredient costs incurred by dispensers (retail pharmacies for Medicaid, and medical providers in the Medicare area).

## M.     PBMs

89.     Third-Party Payors ("TPPs") do not typically look at AWP-WAC but look instead to overall price trends.  This is because most TPPs do not negotiate directly with retail pharmacies to set their rate of reimbursement, but contract with Pharmacy Benefits Managers ("PBMs"), who act as the middlemen between TPPs and pharmacies.  But PBMs make very little money processing TPP claims and look to other sources for generating revenue.  For example, in its 2005 Annual Report, Express Scripts, Inc. reported that it received 35% of its revenue from

mail order operations compared to 1% from services offered to TPPs.[5]  Similarly, in its 2005

Annual Report, Medco identified client services as less than 1% of its overall revenue, while its

mail order business accounted for 37%.  One observer recently explained the evolution of PBM

services and competition as follows:

> Initially, the goal of the PBM was to simplify the administration of
> benefits for health plan members and to provide some cost-
> management services. . . .  In the early 1990s, as electronic point-
> of-sale (POS) claims processing became prevalent, PBMs began to
> shift their dependence on revenue from claim processing to other
> sources, including manufacturer rebates, selling data to
> manufacturers, and selling mail order and retail drugs.  PBMs
> found that health plans and employers were more interested in
> lower administrative fees, because the result of pharmacy-cost
> reduction appeared to be too difficult to measure.  This practice
> created a price war among PBMs for business from large health
> plans and resulted in a perception of POS pharmacy claims as a
> commodity. . . .  ***Gradually, the PBM industry shifted to
> aggressive strategies of seeking revenues from alternative
> sources to compensate for selling benefit administration services
> at lower costs.***  PBMs that could not buy or build mail order
> capabilities quickly turned to other revenue sources.  These
> included the sale of claims data to drug manufacturers and
> repricing of the retail network, known as spread pricing (fees
> gained through continual negotiation of lower rates with the
> pharmacy network that are not passed on to the health plan or
> employer).  ***Today, revenue from POS claims processing provides
> little to no margin for PBMs.***[6]

90.    Mail order services are a particularly lucrative source of revenues for PBMs.  In

their mail order capacity, PBMs stand in the same shoes as McKesson's retail pharmacy clients

by profiting from the AWP increase.  Thus, PBMs had a strong incentive to remain silent about

the Scheme or risk losing additional profits stemming from new mark-ups.

---

[5] Express Scripts 2005 Annual Report.

[6] Steve Martin, "PBM Industry Today: Who's Managing Drug Costs?", *Managed Care Magazine*,
Dec. 2001, http://www.managedcaremag.com/archives/0112/0112.pbmfuture.html, accessed August 29,
2007 (emphasis added).

**N.     U&C Payors**

91.     Additionally, there is a significant portion of the population who are uninsured or underinsured and who pay for drugs in cash.  This is referred to in the industry as the usual and customary ("U&C") charge.

92.     U&C payments are tied to the reported AWPs, and are usually set at a price above AWP or at a minimum above the pharmacy's AWP-based Third-Party reimbursement formula. Hence an artificial increase in the AWP uniformly impacts such consumers.

93.     These are the most vulnerable of all consumers purchasing drugs.  They have no power to negotiate discounts.

**O.     The Brand Drug Pharmaceutical Market was Conducive to the Scheme**

94.     The market for brand-name prescription drugs has a number of features that facilitated the implementation of the Scheme alleged in this Complaint.  The industry relies almost exclusively on electronic publishers for the source of AWPs, especially First DataBank. Additionally, for the period of 2001 through late 2004, First DataBank and Medi-Span acted as one for the purposes of calculating and publishing AWPs:  "This means that essentially the Medi-Span data is the First DataBank data."[7]  First Data was therefore the industry standard bearer for both AWP, and by implication, AWP-WAC mark-up. Changes at First Data would affect prices throughout the industry.[8]

**P.     Private and Public End Payors Rely on Published Drug Pricing Compendia**

95.     The private and public pharmaceutical reimbursement systems have at their core critical dependence and reliance upon accurate and timely publication of the current AWP for every active formulation of drugs dispensed by retail pharmacies in the country, given the breath

---

[7] MCKAWP 0057171; MCKAWP 0057415.

[8] MCKAWP 0057171.

of this dependence (private insurance systems covering more than 200 million lives as well as millions of cash payors); the healthcare system's growing reliance on pharmaceutical products as a treatment of first resort; and the scores of thousands of available drugs on the market. Private (and public) reimbursement systems, including the plan sponsors and consumers who reimburse drug dispenser costs, also rely upon pharmaceutical pricing publishers to accurately and fairly publish AWPs and WACs for NDCs. McKesson and FDB were aware of this reliance.

96.     Several pharmaceutical industry compendia periodically publish the AWPs for active NDCs in the United States. Generally these publications are available in either hard copy format or in electronic media.

97.     Generally speaking, the two printed compendia include Drug Topics Red Book (the "Red Book") (published by Thompson Healthcare) and American Druggist First DataBank Annual Director of Pharmaceuticals and Essential Director of Pharmaceuticals (the "Blue Book") (which for several years has been defunct). While the Red Book is used to determine published AWPs (primarily for physician-administered drugs), and while certain limited electronic information is available regarding Red Book published prices, the Red Book remains primarily an annual printed publication with periodic printed updates.

98.     In periodically announcing the AWP for each drug, publishers generally report prices that are supplied to them by manufacturers for their respective drugs. For instance, the foreword to the 1999 edition of the Red Book states that "all pricing information is supplied and verified by the products' manufacturers, and it should be noted that no independent review of those prices for accuracy is conducted." In addition, a June 1996 Dow Jones news article reported that Phil Southerd, an associate product manager of the Red Book, stated that Red Book only publishes prices that are faxed directly from the manufacturer.

**Q.     The Emergence of First Data and Medi-Span as Electronic Data Publishers**

99.     In addition to printed publications of pharmaceutical prices, the AWP for NDCs is also widely made available to manufacturers, wholesalers, retailers (including major chain pharmacies, independents, mail orders), pharmacy benefit managers and Third-Party Payors (*i.e.*, plan sponsors of drug benefit plans such as insurers, Taft-Hartley Funds and self-insured employers) through large electronic drug databases.

100.     Drug databases started back in the mid-1970s with the advent of significant drug benefit programs.  These programs, along with the pharmacists who are dispensing the drugs and the Third-Party Payors (primarily insurance companies) who are paying for them, needed comprehensive and accurate descriptive and pricing information to ensure the accuracy of the claims they were paying.

101.     The processing of claims became a massive job as drug prescriptions increased. The need for a consistently accurate and comprehensive drug price database became a major need.  As First Data documents acknowledge, the "specter of inaccurate drug prices drove the database companies to develop techniques to assure the accuracy and comprehensiveness of the data."

102.     During the 1990s, there were only two major electronic drug database companies: (1) First Data, which describes itself as "started as the only purely electronic database company;" and (2) Medi-Span, which had its roots in the printed drug price catalog business.

103.     The principal products sold by First Data are based upon information contained in its National Drug Database Files, or "NDDF."  The NDDF is a massive electronic database dating back many years and containing scores of fields of information for both active and non-active NDCs.  Among many other pieces of quantitative and non-quantitative information contained in the NDDF are the current and historical WAC, (known in the NDDF as the

- 29 -

wholesale net price, or "WHN") and AWP, (set forth in various fields, including an AWP field designated by First Data as Blue Book AWP or "BBAWP") for each NDC.

104.    The principal electronic database products sold by Medi-Span are based upon its Master Drug Database Files, or "MDDF."  The MDDF electronic database is smaller than the NDDF, but nevertheless contains numerous fields of data for each NDC, including current and historical WAC, and AWPs.  Both the NDDF and the MDDF are comprehensive, intragratable drug information databases.

105.    Comprehensive, intragratable drug information databases ("intragratable drug data files") are electronic databases containing purportedly comprehensive clinical, pricing, and other information on prescription and non-prescription medicines.  Intragratable drug data files are uniquely capable of being readily integrated with other computerized information systems to help pharmacists and Public Payors quickly obtain information important to decisions regarding the prescription, dispensing, price reimbursement and purchase of medicines, and also to automatically provide drug information that patients need for safe use of their drugs.  Retail pharmacies and PBMs usually use intragratable drug data files to determine Public Payor reimbursement (when using AWP fields), as well as their own acquisition costs (when using WAC fields).

106.    Drug information in other forms is usually not an adequate substitute for the provision of much information obtainable only in intragratable drug data files.  For example, a pharmacist filling a prescription can more quickly and reliably check for harmful drug interactions through an instant, automatic check of a drug data file when he or she enters the prescription into the pharmacy's computer system, than through consulting a separate, unintegrated, and less up-to-date information source such as a book or data on a compact disk.

Relying on such a separate reference would be more time-consuming and would increase the risk that a harmful drug interaction would not be detected until after the patient purchased and used the drug.

107.    During the 1990's and up to 1998, First Data and Medi-Span were substantial, direct competitors within the relevant market of intragratable drug data files in the United States. They faced little or no competition from other firms.  Until 1998, two electronic drug databases – First Data's NDDF and Medi-Span's MDDF – played the integral role in essentially all electronically-based drug reimbursement transactions in the United States  They accounted for billions of transactions each year and many billions of dollars of payments.

108.    Of course, First Data's NDDF and Medi-Span's MDDF both contained critical price point data fields for the approximate 65,000 NDCs then active in the marketplace.[9]  The retail class of trade relies on these systems and uses the AWP for the associated NDC when seeking reimbursement for drug ingredient cost.

**R.    The Merger of First Data and Medi-Span Systems**

109.    In 1998, the Hearst Corporation caused First Data to be merged with the smaller Medi-Span.  After the merger, First Data began the process of combining its NDDF with Medi-Span's MDDF (resulting in a product sometimes known as NDDF Plus).  Through this process, the Hearst Corporation caused First Data to become the sole United States provider of intragratable drug data files, including the publication of electronic drug database pricing information such as the WAC and associated AWP for branded pharmaceutical products.  Thus, beginning in or around 1998 and thereafter, virtually every participant in the pharmaceutical distribution chain who used electronic database systems in undertaking reimbursement

---

[9] First Data's NDDF also contains historical information, and thus it contains data for almost 200,000 NDCs since many are no longer active in the marketplace.

transactions for billions of dollars of pharmaceutical products used and relied upon the accuracy of data from First Data's NDDF and MDDF, including the published WAC and AWP price fields.

110.    In 2001, the Federal Trade Commission (after a lengthy investigation) brought suit against the Hearst Corporation and First Data claiming, among other things, that the First Data and Medi-Span merger had been unlawful.  Shortly thereafter, the Hearst Corporation agreed to divest its Medi-Span assets, culminating in a consent decree late that year.  But by this time, First Data's merger of the NDDF and MDDF, along with changes of personnel and related systems effectuated over the prior three years, was nearly complete.  As a result, as part of First Data's divestiture of the Medi-Span assets, First Data was required to provide the purchaser of the Medi-Span assets with transitional and editorial services for many years into the future.

111.    As a practical matter, pricing data contained in both the NDDF and the MDDF post-divestiture remained the same.  Since 1998 and despite the late 2001 divestiture, First Data has functioned as the sole editor of data populating the only available comprehensive intragratable electronic drug data systems (the NDDF and the MDDF) for branded drug pricing information used in the United States for reimbursement transactions in the retail pharmacy channel.

112.    All changes in First Data's electronically published AWPs and WAC-to-AWP spreads were the same.  The consent decree that implemented the Medi-Span divestiture from FDB required that FDB continue to provide Medi-Span with all FDB pricing information until Medi-Span (now called Facts and Comparisons) could develop its own pricing production system.  Thus, during the time period including August 1, 2001 until sometime in 2004, when the Scheme effectuated an increase in First Data's published spread, this increase also occurred in

Medi-Span's published prices and has remained in effect through the present. FDB and McKesson knew this would be a consequence of the Scheme.

113. During the 1990s and up to the end of 2001, both First Data and Medi-Span maintained the historical proportion between AWP and WAC when branded price increases were announced. This enabled the publishers (when receiving, for example, information only regarding WAC changes to a branded drug) to automatically calculate the corresponding AWP. As a result, the marketplace had predictability, and marketing pricing dynamics adjusted according to that expected practice.

**S.    First Data Gains the Trust of the Pharmaceutical Industry**

114. Before this and related litigation against McKesson began, pharmaceutical end payors operated on the belief that the AWPs were the result of both honest reporting by pharmaceutical companies, with respect to the publication of their WACs or submission of their suggested AWPs to publishers, and an empirical and professional analysis undertaken by First Data or Medi-Span.

115. The reliance upon the accuracy and legitimacy of First Data's data was not only known to First Data, but was the foundation of its business model, marketing, and promotion plans. For example, First Data stated:

> For over two decades, healthcare professionals have come to depend on First DataBank's comprehensive knowledge bases to deliver the timely, accurate drug information they need to support their business and clinical decision-making.
>
> Thus developers can respond quickly to their customers' demands for reliable, easy-to-access drug information, available on multiple platforms.
>
> [First Data:] A partner you can trust.
>
> Trusted Drug Knowledge…Comprehensive drug knowledge bases that have been trusted for decades by healthcare professionals – in thousands of installations – to provide the timely, accurate

- 33 -

information they need to support their clinical and business decision-making.

116.    First Data promoted its pricing information as "accurate," of "high-quality," and as "set[ting] the standard in the healthcare industry for comprehensive coverage of descriptive, pricing and clinical information on drugs."  It also recognizes that its pricing information is "relied upon by professionals in th[e] industry," and that, "***[t]o be useful to its audience, First Data's data must be accurate and up-to-date***."

117.    Throughout the 1990s, First Data gained the trust and reliance of participants in the pharmaceutical marketplace – most notably pharmacies and the Third-Party Payors that reimbursed them – upon First Data's electronic publication of AWP for each active NDC.

118.    Throughout this time, First Data knew, of course, that the primary purpose of publication of the WAC and of the AWP, and of the associated WAC-to-AWP mark-up (embedded in the difference between the AWP and WAC data fields), was to serve as an electronic basis for the mass-reimbursement of retail pharmacies for thousands of daily transactions and billions of yearly transactions.  After all, First Data acknowledged:  "AWP was developed because there had to be some price which all parties could agree upon if machine processing was to be possible."  As First Data stated:  "AWP represents the average wholesale price; the average price a wholesaler would charge a customer for a particular product.  The operative word is ***average***.  AWP was developed to provide a price at which all parties could agree upon for electronic processing to be possible."

119.    First Data's representations regarding the accuracy of its electronic publication of AWP were highly successful.  By 1998, after its acquisition of its only competitor, Medi-Span, First Data was the sole provider of comprehensive, intragratable electronic data files providing AWP information throughout the retail pharmacy distribution chain, including most private

- 34 -

Third-Party Payors. Of course, First Data made this known when marketing its products, stating that it "provides you the same AWP prices used by Aetna, PAID PCS, MEDI, MET, most Blue Cross Blue Shield Plans, wholesalers and approximately 49 Medicaid programs."

**T.    The Scheme Created Goodwill for McKesson with Its Retail Pharmacies**

120.    The difference between the WAC and the AWP prices "create[s] the gross margin for pharmacy retailers under third party reimbursement plans.[10] As the difference between AWP and WAC increases, the larger "spread" affords retailers and other middlemen like pharmaceutical benefit managers ("PBMs") opportunities for larger profits.[11]

121.    By engaging in the Scheme with First Data to raise AWPs by increasing the AWP-WAC mark-up on all brand-name drugs to a uniform 25%, McKesson created goodwill with its customers-retailers. By doing so, McKesson and First Data defrauded end payors like Plaintiffs, who purchased the drugs involved in this lawsuit at prices inflated by the Scheme.[12]

**U.    By 2001, First Data WAC-to-AWP Mark-ups Were Susceptible to Abuse**

122.    Traditionally, AWPs were set by manufacturers and provided to publishers.[13] Publicly, McKesson itself recognized that WAC-AWP mark-ups originated from manufacturers, not wholesalers.[14]

123.    Beginning in the late 1990s, due to government scrutiny and well-publicized AWP-related litigation, many manufacturers stopped providing AWPs.[15] Some manufacturers

---

[10]  MCKAWP 0073551.

[11]  MCKAWP 0069612.

[12]  Updated Declaration of Dr. Hartman in Support of Class Certification (December 20, 2006) at 5.

[13]  MCKAWP 0084296; MCKAWP 0083898; MCKAWP 0067439; AZ0449836-449850.

[14]  One McKesson employee explained to an employee of WellPoint's PBM in November 2004 that "McKesson does not maintain or alter product AWP's – we get that specific information from the manufacturer and from First DataBank. McKesson, of course, establishes that cost based upon industry practices and our cost from the manufacturer." WP-AWP009699-9703, at 9699.

[15]  Morgan 2007 Dep. at 228:25-229:12; *see also* RB 00157-RB 00171, at 00158 ("[W]e were concerned when the average wholesale price (AWP) designation - one of several pieces of data that Red Book collects from manufacturers - came under fire at federal and state levels this past year. . . . We

even ceased providing First Data with <u>any</u> price information (AWP or WAC), making First Data increasingly dependent on wholesalers for price information.[16]

124.    Wholesaler Amerisource Bergen Corporation ("ABC") recognized that First Data's AWP became a standard in the late 1990s *because* manufacturers were no longer publishing AWP.

125.    First Data knew that the market widely relied upon First Data AWPs and that it played a crucial role as the most trusted supplier of such information.  First Data knew that its preeminent position in the market would be at risk if First Data admitted that it did not have a reliable basis for calculating AWPs.

126.    Beginning in the 1990's, First Data adopted a survey method to calculate AWPs.[17] First Data represented that its survey methodology asked *each* of the national wholesalers what mark-up they applied to a given manufacturer or product line.[18]

127.    As detailed below, at least by August 2001, when Amerisource merged with Bergen and when McKesson and First DataBank began their collusion, First Data's representation was no longer true.  If it had been conducting regular surveys of each of the major wholesalers before, it certainly was *no longer doing so* by August 2001 because two of the "big three" wholesalers, ABC and Cardinal, refused to provide mark-up information to First Data. This propelled First Data to conspire with the remaining "big three" wholesaler, McKesson, so that it could continue publishing AWPs.

---

continue to regard AWP as one guideline in the Rx pricing mix and to encourage the provision and dissemination of fair, accurate prices by all suppliers.").

[16] Morgan 2007 Dep. at 179:12-22; MCKAWP 0069640 (Morgan e-mail acknowledging that FDB is missing manufacturers' WACs, noting that FDB is authorized to obtain them from wholesalers and requesting them from McKesson).

[17] *See*, *e.g.*, FDB-AWP 15104.

[18] *See*, *e.g.*, FDB-AWP 02005 (FDB website, Frequently Asked Questions, dated November 4, 2002); FDB-AWP 15104 ("Average Wholesale Price," Price Alert editorial, dated 2000).

### V.    MCKESSON EXPLOITED FIRST DATA'S ALLEGED SURVEY PROCESS FOR ITS OWN PURPOSES

### A.    McKesson's Public Position Was That AWPs Were Determined by Manufacturers' Historic Mark-Ups and not by McKesson

128.    In January 2002 McKesson organized an upper-management "meeting to discuss McKesson's position regarding Average Wholesale Price."[19]  Greg Yonko, Senior Vice President of Purchasing and Pharma Finance, who was invited to this meeting, asked if he could "add Robert James to the invite list as he has had numerous discussions with First DataBank recently."[20]  Mr. Yonko testified that he wanted Bob James, McKesson's Vice President of Brand Rx Finance Investment Purchasing, to take part in the meeting because

> Bob was managing the process that I have described many times
> around -- with First DataBank, relative to the markups that we
> carry in our system, the survey process, the updates to WAC.
> Again, many business aspects that have to do with First DataBank,
> Bob would seem to be more knowledgeable about than anybody
> else that I knew about.[21]

129.    Both Bob James and Greg Yonko attended the meeting,[22] which took place on or about January 16, 2002.[23]  Among the topics discussed were "how different reimbursement models or change in reimbursement models might look,"[24] and "the legislative momentum surrounding the issue of Average Sale Price vs. Average Wholesale Price vs. Wholesale Acquisition Costs (WAC) and the complexities and potential implications to our customers of any such changes and eventually to our company [McKesson]."[25]

---

[19] MCKAWP 0065896.

[20] MCKAWP 0065896.

[21] Yonko (5/15/07) Dep. at 85:13-20.

[22] Id. at 85:22-86:2; MCKAWP 0084295.

[23] Yonko (5/15/07) Dep. at 87:8-11.

[24] Id. at 89:10-12.

[25] MCKAWP 0084295.

- 37 -

130.    At the meeting, it was agreed that Greg Yonko and Jeff Herzfeld, Senior Vice President of Pharmaceutical Product/Pharma Finance, would "develop a position statement" that could be used to "communicate throughout our management team so that we are on all on the same page, so-to-speak, when discussing such issues with our customers, suppliers, and any legislative types."[26]

131.    Yonko circulated a draft of the official McKesson position, which defined AWP as a suggested retail price set by manufacturers' historic mark-ups and not established by McKesson:

> **What is AWP?** - AWP or Average Wholesale Price represents a suggested retail-selling price for a branded or generic pharmaceutical and has been around for many years.  Its [sic] calculated as a markup from WAC (Wholesale Acquisition Cost). The markup typically runs 20 to 25 % and is for the most part determined by historical spreads from the manufacturer (***not by McKesson***).  McKesson carries the price in our system and adjusts it if there is any pricing action.  First DataBank publishes this price and it is the basis for all retail pharmacy dispensed prescriptions that are covered by 3rd Party reimbursement plans for branded products.[27]

132.    According to this official position, McKesson did not meddle with the manufacturer-set AWP carried in its system and only adjusted the price if there was a pricing action, that is, if the manufacturer changed its WAC.[28]  And McKesson represented that it understood First Data to publish the AWP consistent with the manufacturers' historic mark-up.[29]

133.    Notably, this policy, which was intended for public consumption, did not refer to McKesson's participation in wholesaler surveys of AWP or state that AWP was in any way

---

[26] MCKAWP 0084295.

[27] MCKAWP 0084295 (emphasis added).

[28] *Id.*

[29] *Id.*

affected by a wholesaler pricing policy.[30]  To the contrary, McKesson expressly disavowed ***any***

***involvement*** in determining mark-ups.[31]

## B.    Contrary to its Official Position, McKesson Raised its Internal Mark-Ups in an Effort to Increase AWPs

134.    Although publicly disavowing its involvement in setting AWP/WAC mark-ups,

McKesson had already begun as early as 2000 to manipulate AWPs by unilaterally imposing a

25% mark-up on its suggested sell price for all brand-name prescription drugs.[32]  At his

deposition, Greg Yonko confirmed that in the past McKesson had used the manufacturers'

historic mark-ups to calculate projected retail prices, *i.e.* its suggested sell prices:

> Q.   How did McKesson calculate its suggested sell price?
>
> A.   It's not a calculation.  It was a number that we input into our system, and it was again historical, provided by the manufacturer, though it's currently not.[33]

He also conceded that McKesson had increased the mark-up for its suggested sell prices with the

intent that FDB would use the higher mark-up to set AWP:

> We are in business to support our customers, and we have always supported our customers.  And I believe that is what Bob is talking about when he says we have attempted to raise AWP's to support our customers, by changing our markup in our system, going through the First DataBank survey process, and hoping that, in fact, the AWP's will change.[34]

135.    McKesson knew that First Data had a virtual lock on the determination of AWPs

because First Data had "a contract with the Medi-Span group [the only other electronic pricing

---

[30] *Id.*

[31] "The markup . . . is for the most part determined by historical spreads from the manufacturer (not by McKesson).  *Id.*

[32] MCKAWP 0057171; MCKAWP 0047807 ("Our mark up is not coming from our suppliers. Suppliers [have] nothing to do [with] how we mark up our items.  It is the Product  Management team who make[s] the decision on our mark up.")).

[33] Yonko FDB Dep. at 42:15-20.

[34] Yonko FDB Dep. at 41:8-14.

source] requiring that FDB supply the data over the next 3 or 4 years [*i.e.* through 2005 or 2006]. This means that essentially the Medi-Span data is the First DataBank data."[35]

136.    McKesson knew that First Data purported to use a survey of national wholesalers to calculate AWPs and that, as the largest national wholesaler, McKesson had "an opportunity to 'normalize' AWP spreads on brand pharmaceuticals at a 25% markup (or 20% spread)."[36]  And if it were to succeed, "most [of its] customers would love it."[37]

137.    Thus, it changed its mark-ups "in hopes that one of the other wholesalers happens to raise their markup on an item (maybe due to pressure from retail customers), and FDB happens to resurvey the items."[38]  But when the competition did not respond as expected or First Data failed to "survey" the change as quickly as hoped,[39] McKesson decided to work directly with First Data to increase AWPs.

---

[35] MCKAWP 0057415; *see also* MCKAWP 0057171 ("[Medi-Span gets] . . . its data from FDB. However, Redbook is a different deal.  Redbook publishes the AWP's that the manufacturers give them (which is not an average, nor determined by process) or use a markup of 1.20 which provides a 16 ⅔% AWP spread.  If your customers are allowing language to be put into their contracts allowing Redbook AWP's for reimbursement, they are not being very wise.").

Prior to 2001 First Data and Medi-Span were jointly owned by the Hearst Corporation.  Following an investigation and lawsuit brought by the Federal Trade Commission Hearst agreed to a divestiture of Medi-Span assets.  Hartman Decl. (Dec. 2006) ¶ 17. As part of the divestiture, First Data was required to continue to provide pricing information to Medi-Span's purchaser for several years.  *Id.*, *see also* MCKAWP 0057415; MCKAWP 0057171.

[36] MCKAWP 0068514.

[37] *Id.* (MCKAWP 0068514).

[38] MCKAWP 0068514.

[39] *See, e.g.*, MCKAWP 0068514 ("McKesson chose to increase the markup on the Park-Davis line (Lipitor) [in January 2001] when Pfizer took them over.  This was our [McKesson's] attempt to raise the AWP's to support our customers.  The other two wholesalers did not do this.  (I [Bob James, Director, Brand Pharmaceutical Production Management, McKesson] am told by FDB that the Parke-Davis products from Pfizer will most likely have the AWP's increased to 20% this January [2002] when price increases typically take place. . . . this will then be the same as the McK figure."  (ellipsis in original)).  *See also* MCKAWP 0065883-84 (September 18, 2001 e-mail noting that "Amerisource has pointed out to some of our customers in the Michigan market that we 'manipulate' AWPs on selected items," and that McKesson's internal mark-ups for Lipitor and Advair were higher than FDB's or Cardinal's).

001821-16 288655 V1

138.     In many of its internal communications McKesson candidly admitted that the change was made to increase its customers' profit margins.[40]  For example, McKesson's John Bonner, Director of Brand Rx Product Management and Finance, observed:  "There's been a great deal of activity, by McKesson, of late to increase AWPs on brand items to a uniform 25%.  *That helps the pharmacy profitability greatly.*"[41]  Reflecting on his achievements as of April 2003, Bob James noted:

> We played a major role (and still do) in normalizing the AWP's on Brand Pharmaceuticals from 16 ⅔% to 20% spreads [*i.e.* 20 to 25% markups].  This has had a huge impact on the profitability of our customers on their insurance based business (which is about 90% now).  To summarize this impact, it's the same as lowering their cost of goods 3 ⅓% on 70% of the brand drugs.  Historically, 75% to 80% of brand pharmaceuticals carried a 16 2/3% AWP spread and the remaining, a 20% spread.  Today, almost 95% of brand drugs carry a 20% spread.  This has provided millions of dollars in improved profits across our industry.[42]

Another McKesson employee explained:

> I received a response to an e-mail last week from John Bonner.  He mentions that McK is working to increase the spread on AWP to a uniform 25% on branded Rx.  One of the benefits of this will increase reimbursements to our customers from third parties.[43]

Yet another McKesson employee reported:  "What Bob explained to me a few months ago is we (mckesson) [sic] are working to 'expand' the margin between AWP and cost."[44]  An internal memo discussing the mark-up changes states:

> Here are a few examples of increased profits that our customers should be realizing now and into the future.  The following results are based on a reimbursement formula of AWP minus 15% plus a $2.00 fee.

---

[40] *See, e.g.,* MCKAWP 0042664; MCKAWP 0065592; MCKAWP 0065885; MCKAWP 0066191-92; MCKAWP 0066464; MCKAWP 0068131; MCKAWP 0069594; MCKAWP 0069607; MCKAWP 0069615; MCKAWP 0071670; MCKAWP 0084327; MCKAWP 0084485.

[41] MCKAWP 0050602 (emphasis added).

[42] MCKAWP 0065592.

[43] MCKAWP 0066465-66.

[44] MCKAWP 0069732.

|  | Old 16⅔% spread | New 20% spread |
|---|---|---|
| Lipitor 20 mg 90's | $6.86 | $17.18 |
| Prilosec 20 mg 30's | $4.22 | $8.92 |
| Allegra 60 mg 100's | $3.97 | $8.16 |
| Advair Discus 500/50 |  |  |
| 60 dose | $5.11 | $11.70 |
| Betasteron (previously a flat $7.00 fee) |  |  |
|  | $20.00 | $58.25 |

Most would agree that these improvements are extremely significant.[45]

139.    In other communications, McKesson represented that it increased its mark-ups for

"business efficiency purposes" because McKesson's Retail List Prices and First Data's AWP

often did not match:[46]

> [W]e were challenged to improve efficiencies in our systems, processes and execution of our Brand Rx Programs.  One of the inefficiencies that we looked at was the number of manual overrides that were required to keep an accurate First DataBank (FDB) Average Wholesale Price (AWP) field in our system.  Each time a pricing activity took place, a manual override was necessary when the Suggested Sell or Retail List Price was different from the FDB AWP.  This took place several times a year and increased risk of errors.[47]

McKesson estimated that at the time 80% of brand mark-ups were set at 20%.[48]  Yet rather than

synching its mark-ups with those actually used by FDB, McKesson reached the following

decision:  "A decision was made to standardize our Brand Rx markups at 25% by using a 1.25

factor times the Wholesale Acquisition Cost (WAC)."[49]

---

[45] MCKAWP 0069609.

[46] *See, e.g.*, MCKAWP 0042663; MCKAWP 0065885; MCKAWP 0069608; MCKAWP 0069613.

[47] MCKAWP 0069608.

[48] MCKAWP 0069502.

[49] MCKAWP 0069608.

140.    Logically, the only way that raising mark-ups to 25% in an industry dominated by

20% mark-ups would eliminate McKesson's "manual overrides" arising from price discrepancies

with FDB is if FDB colluded with McKesson to increase AWPs across the board.  In an e-mail,

dated September 18, 2001, McKesson explains:

> We are talking with First DataBank about "normalizing" the Brand
> AWP spreads at 20% because we believe it makes sense for our
> customers and also for our own efficiency in BIS.  Today, when
> our AWP differs from First Data Bank [sic], BIS has to manually
> input the FDB AWP's.  This translates to a great deal of extra work
> on every price increase where this situation exists.  ***If all Brand
> product was at 25% markup none of this manual input would be
> necessary.***[50]

141.    McKesson discovered that it was not difficult to impose its suggested sell prices

on First Data's published AWPs.  In an October 9, 2001 e-mail, while still paying lip service to

an alleged survey process, McKesson marveled at "First Data Bank's willingness to work with

us to normalize the brand product AWPs."[51]

## C.    McKesson Colluded With First Data to Increase Brand Drug Mark-Ups

142.    As documented in an internal memo, McKesson began colluding with First Data

to increase brand drug mark-ups as early as August 2001:

> After a discussion with FDB last August [2001], ***we mutually
> agreed*** to standardize Searle (16⅔% spread) product line because it
> had been acquired earlier by Pharmacia (20% spread).  There
> seemed to be momentum in the industry to move to a normalized
> markup of 25% on brand Rx products.  In December [2001], after
> several discussions with FDB about our business efficiency
> improvement strategy we began to move many of the
> manufacturers with mixed spreads (16⅔ and 20% products in the
> same line) to a consistent 25% markup.  These were companies
> like GlaxoSmithKline, AstraZeneca, Aventis, Berlex, Bristol
> Myers Squibb, Merck, JOM, and 3M, Forest, Novertis, Roche,
> Schering and several others.  These were mixed product lines and
> we just set their Suggested Sell Prices at a consistent 25% markup.
>
> First DataBank re-surveyed most of these companies during
> January and February when price increases occurred.  Many of the

---

[50] MCKAWP 0065885 (emphasis added).

[51] MCKAWP 0068599.

> AWP's have been increased by FDB.  Because a large number of
> price increases occurred, some AWP's were affected twice, once
> when the price increase[] took effect and then a second time when
> FDB raised the AWP after the survey process. . . .  Not all products
> in these companies have had AWP increases at this point in time.
> However, as price increases occur FDB will re-survey those
> products and make their determination.[52]

143.     While the memo invokes the survey process, First Data's express agreement to

raise the mark-up on Searle products is inconsistent with the use of a survey to ensure the

appropriate mark-up.   More fundamentally, McKesson's "business efficiency improvement

strategy," *i.e.* the goal of achieving harmony between its uniform 25% mark-up and FDB's data,

could only be achieved if FDB agreed to disregard contrary input from other industry sources

and to override historical mark-ups.

144.     Indeed, it was Erlinda Thomas' understanding at the time that she wrote the

following March 14, 2002 e-mail that McKesson dictated the price changes to FDB:

> Product Management is working closely with FDB to adjust their
> mark up.  FDB [has] been changing their mark up to match with
> our mark up.  Eventually our list price will [be] equal to FDB's
> AWP.[53]

145.     The memo's discussion of an agreement with First Data is also reflected in a

September 18, 2001 e-mail in which McKesson also referred to its recent "agreement with First

Data Bank on raising" Searle prices.[54]  The e-mail further revealed:  ***We are talking with First***

***Data Bank about 'normalizing' the Brand AWP spreads at 20%*** [*i.e.* markups at 25%] because

---

[52] MCKAWP 69608-09 (emphasis added).  Note that one of the named manufacturers, GlaxoSmithKline ("GSK"), wrote on March 1, 2002, to First Data asking it to explain the "unexpected change" which led First Data to list GSK products with a 25% mark-up.  FDB-AWP 053695.

[53] MCKAWP 0042664; Thomas Dep. at 109:6-110:7 (testifying that she believed that the statement was true at the time she wrote it).

[54] MCKAWP 0065885.  Nor can there be any doubt that First Data was aware that the mark-up information that McKesson provided was made up from whole cloth.  In addition to the preceding documents referring to discussions with First Data about its normalization plan, the record also reveals that McKesson sent First Data a copy of its internal memo, titled "AWP Discussion," in which it stated:  "McKesson has chosen to 'normalize' the markups in the Brand Rx area resulting in a consistent 25% markup or use of a 1.25 factor.  This serves to level the playing field"; "customers may potentially benefit because this process provides the opportunity for increased profitability if managed care contracts remain as they are today."  MCKAWP 0069602; MCKAWP 0069611.

we believe it makes sense for our customers."[55]  The October 9, 2001 e-mail, applauding "First Data Bank's willingness to **work with us** to normalize the brand product AWP's,"[56] suggests that McKesson prevailed and the agreement was expanded to all brands.

146.    Other evidence also supports this inference.  Consistent with an arrangement to change the mark-ups on brand drugs to a uniform 25%, FDB changed the mark-up for TAP and AstraZeneca to 25% on December 15, 2001.[57]  The internal e-mail directing the change does not mention a survey, and FDB did not produce any documentation tending to show that a survey was conducted to warrant the changes.[58]

147.    On January 23, 2002, another McKesson e-mail observed:  "AstraZeneca, Aventis, Bristol Myers, Glaxosmithkline, Jorn etc.  These vendors are now at a 25% mark-up instead of 20%.  **Bob James is in contact with FDB in regards to adjustment of their AWP pricing.**"[59] The McKesson e-mail does not refer to a survey process, and there are no FDB documents purporting to show that the changes to these manufacturer mark-ups were made as a result of a wholesaler survey.

148.    Later that month, McKesson's John Bonner, Director of Brand Rx Product Management and Finance, noted:  "There's been a great deal of activity, by McKesson, of late to increase AWPs on brand items to a uniform 25%.  **That helps the pharmacy profitability greatly**."[60]  He advised a sales manager to let customers "know we are fighting on their behalf to

---

[55] MCKAWP 0065885 (emphasis added).

[56] MCKAWP 0068599 (emphasis added).

[57] FDB-AWP 033430.

[58] *See* Morgan (2007) at 278:16-279:9 (testifying that she could not recall any other written surveys other than those produced by FDB and identified as exhibits at her deposition).

[59] MCKAWP 0081250 (emphasis added).

[60] MCKAWP 0050602 (emphasis added).

normalize AWP @ 25% markup."[61] Again there is no disclaimer that the AWPs are in fact

determined by objective surveys as opposed to McKesson's acknowledged price manipulation.

149.     Another internal e-mail demonstrates the same understanding:

> Some of our friends in retail that I have spoken with are pretty
> overwhelmed *that we would be 'driving' this process on their
> behalf*.  Of course, we are not solely responsible for this
> 'normalizing' of AWPs but we have done our part as I have
> discussed with you previously.  I have had conversations with
> Albertsons and Safeway and a few others.[62]

150.     McKesson documents also report that Bob James called Kay Morgan in early

2002 "on behalf of VitaRx on Avonex and Copaxone" and reported that the call "result[ed] in a

$500K profit improvement for VitaRx," and "FYI.  Kay Morgan, FDB confirmed today that this

had been done."[63]  After the call, James circulated an e-mail:

> Just a note to let everyone know that "I am told" that the markup
> on Avonex and both the old and new sku's of Copaxone will be
> changed to 25% (to create a 25% spread on WAC/AWP) next
> week. . . . . Yes!!"
>
> . . . .  This should have a significant contribution to your
> profitability as illustrated by the following example using a
> reimbursement of AWP – 15% plus $2.00 fee
>
> Avonex at 16⅔% spread, profit would be $18.42 . . . and now at a
> 25% spread, profit would be $51.31 . . .not bad!
>
> This is an increase of $32.89 per script.
>
> Copaxone at 16⅔% spread, profit would be $19.72 . . . an now at
> 20% spread, profit would be $57.39 . . . pretty good!
>
> This is an increase of $37.67 per script.[64]

---

[61] *Id.*

[62] MCKAWP 0065895 (emphasis added).

[63] MCKAWP 0069615; *see also* MCKAWP 0084327.

[64] MCKAWP 0084327; *see also* MCKAWP 0065592 (April 22, 2003 memo from Bob James to Greg Yonko:  "Worked on behalf of Vita Rx (now MSD) in raising the AWP's of Avonex, Copaxone and Betaseron to 20% [spread].  The impact of this effort was to increase their profits $800 k per year. . . each year, not just one time.").

151.    Other communications do refer to a survey process, but they generally betray

McKesson's expectation that the alleged survey process will merely confirm McKesson's 25%

mark-up.  For example, an e-mail dated February 15, 2002, from Bob James states:

> What we are seeing is a 'normalizing process for brand Rx items.
> As you know, suppliers do not set AWP, wholesalers do not set
> AWP, and neither does FDB.  Wholesalers set their individual
> markups or Suggested Sell or List Price as in the case of
> McKesson. I'm not sure what the other wholesalers call their sell
> price.  This is done independently.  FDB takes a survey of at least
> three national wholesalers and if 2 out of 3 are at 25% markup,
> then that becomes the AWP . . .  I think it is very positive for the
> industry and most people will be delighted when they understand
> what is going on and how the process works.[65]

He then predicts:  "***In a few months I would expect to see most brand products at a 25%***

***markup.***"[66] Given that McKesson is advocating a 25% mark-up in a predominantly 20% market

where such mark-ups have remained largely unchanged for years, James' expectation of

widespread change – let alone such change over a matter of months – is simply not

comprehensible unless he also believed that FDB was complicit in McKesson's Scheme.

152.    This inference is further supported by the statement he makes on February 26,

2002 that he is simply waiting for FDB to "catch up" to McKesson's mark-ups and that he has

been told by FDB that these changes, and the higher AWPs they entail, are imminent:

> The McKesson Sugg. Sell or List Prices for Brand Rx will remain
> at the 25% markup, however.  ***We expect FDB AWP's to catch up
> over the next month or so as things normalize in the industry.***  I
> was not aware until last week that our BIS group was changing the
> AWP field to match or Sugg. Sell or List Price field in the DITM
> before FDB actually made the changes.  ***We have been told by
> FDB that the items were going to move up but there obviously
> have been some timing issues.***  It's my fault, I guess I did not
> communicate very clearly. There will be no changes by the FDB
> AWP field unless the information comes by electronic download
> from FDB.

---

[65] MCKAWP 0069590; MCKAWP 0069591.

[66] MCKAWP 0069592 (emphasis added).

> When the changes do occur, there will be a slight delay for our
> system to be changed.  More importantly, there will most likely be
> a delay for the third parties to pick up and input *the new higher
> AWP's*.[67]

153.    A month later, James' confirms his expectation that FDB has changed the mark-

ups on the majority of brand manufacturers:

> I am told by FDB that 90% of the Brand Rx companies are now
> listed as 1.25 factor or 25% markup companies. Not all the
> products in these companies have had AWP increases at this point
> in time.  However as price increases occur FDB will resurvey those
> products and make their determination.[68]

In light of McKesson's confidence that FDB's AWPs will "catch up" to McKesson's Suggested

Sell or List Prices in short order, this statement leaves open the possibility that by "survey"

James does not mean an objective determination of the prevailing mark-up among the national

wholesalers, but merely the application of the agreed-upon 25% mark-up to the NDCs whose

WAC price was increased by the manufacturers.

154.    Similarly, in response to Erlinda Thomas' representation that FDB adjusted its

mark-ups to match McKesson's, McKesson's field staff personnel, Joy Puccetti, responded:

> Erlinda: thanks for the update.  Can you or our product managers
> give us some idea when all of our LIST prices will be adjusted to
> match FDB's AWP?

James interjected:

> Joy, its really happening the other way around.  McKesson is
> normalizing our Sugg. Sell or Retail List, and AWP increases
> usually happens when FDB re-surveys wholesalers after price
> increases.  They set the AWP where 2 out of 3 national
> wholesalers are using the same markup.  We just happen to be
> improving our process to eliminate the need to override AWPs
> with each pricing activity in the future.  I spoke with FDB earlier
> this week and they stated that about 90% of the vendors have been
> changed to 25% markup and use a 1.25 factor (times the WAC).
> *Some of the detail needs to catch up with individual sku's as
> price increases occur.  The remaining vendors should be done
> over the next quarter.  My guess is that things should look very*

---

[67] MCKAWP 0057428.

[68] MCKAWP 0069609.

> *good in the next couple of months.  I am working with FDB to*
> *point out problem suppliers as Erlinda's group provides me*
> *weekly information comparing our List Price with the FDB*
> *AWP.*  Sorry for the extra confusion and questions that have come
> up from our customers.  The (unintended consequences) results
> should have a very positive impact on our customers['] 
> profitability.[69]

McKesson sends another such coded message in an e-mail, dated April 25, 2002 re "AWP

Situation Status." James advised Greg Yonko of the progress of the Scheme:

> The following is a summary of activity on the subject of AWP:
>
> 1.  There is a movement in the industry to normalize the brand Rx
> markup at 25% to create a 20% AWP spread.
>
> 2.  90% of vendors have been moved to a 1.25 markup factor at
> FDB.
>
> 3.  Actual AWP changes have been occurring around price
> increases and FDB re-surveying the market.
>
> 4. We are working with FDB to improve "their accuracy" on WAC
> pricing because ours is extremely accurate.
>
> 5. . . . We will be sharing information with FDB on WAC price
> changes in order to make us both more accurate.
>
> 6.  McKesson has had no new proactive changes since last
> February except as noted above with Avonex and Copaxone.
>
> * * * *
>
> 9.  All new brand vendors will be set up as 1.25 markup factor
> vendors, *both at McK and FDB*."[70]

While the McKesson e-mail refers to a survey process, it also refers to FDB's agreement to raise

the mark-ups for Avonex and Copaxone – without the benefit of a survey, and there is no

pretense of a survey for new manufacturers.  Their mark-up is set by fiat:  "All new brand

vendors will be set up as 1.25 mark-up factor vendors, both at McK and FDB."[71]   Additionally,

---

[69] MCKAWP 0042663.

[70] MCKAWP 0069615 (emphasis added).

[71] *See also* FDB/NEC 040006 (e-mail from McKesson to FDB: "Any new brand pharmaceutical will
be at 1.25 going forward.").

- 49 -

at least for "about 90% of the vendors," the alleged survey process is perceived as simply a means of applying the pre-determined mark-up "as price increases occur."[72]

155.    John Bonner also represented that McKesson's normalization plan was the driving force behind the changes and not a survey process:

> We are trying to Normalize brand pricing at 25%. As time goes by pricing services will pick up on these changes as they average in.
>
> Medi-Span is owned by First Data Bank and should see the changes eventually.
>
> Please don't use language that we are trying to increase AWP's with customers. We don't want to be viewed as increasing prices but in favor of normalizing branded items as a flat 25% markup that will level the playing field from vendor to vendor.
>
> I really don't see what problem your customer is experiencing in the negative. Higher AWPs should make the pharmacy more profitable.  . . . .
>
> **Bob James is working with FDB to make this happen over time** and I'm not sure it is something we want discussed.
>
> Please contact him before discussing outside the company.[73]
>
> We try to 'push' the AWP up to 25% above WAC rather than 20%. This may cause your customer some short term reimbursement pain with the payors, but in the long run, if AWP at First Data Bank goes from 20% to 25%, **your customer will benefit**.[74]

156.    McKesson's monthly status reports for Rx Brand Product Management also reported its many successes raising AWPs.[75]  And McKesson's efforts to raise AWPs were prominently featured in an internal memo from Bob James identifying accomplishments and developments for 2003.[76]

---

[72] MCKAWP 0042663.

[73] MCKAWP 0066464 (emphasis added).

[74] MCKAWP 0076289 (emphasis added).

[75] MCKAWP 0066191-92 (October 2002) and MCKAWP 0071670 (December 2002).

[76] MCKAWP 0065592.

157. In addition to the foregoing examples from McKesson's internal documents supporting the existence of an agreement or concert of action, the parties' conduct also demonstrates that the AWP survey process had given way to the mark-up scheme.

158. Many of the communications between First Data and McKesson about manufacturer mark-ups were initiated by McKesson, not First Data, and they do not discuss a survey. For example, on November 9, 2001, Bob James wrote to Kay Morgan:

> Hello Kay . . . . . . . . . Just went through the Merck items and updated a couple of our items to 25% markup. However, I found some items that you might want to review. They include Noroxin's, Prinivil and Prinzide's. The latter two, should probably be consistent with the new AZ 1.25 markups.[77]

159. On other occasions, Bob James also gently reminded First Data to raise AWPs on certain brands:

> Hello Kay, this note is from BMS [Bristol-Myers Squibb] and is basically saying that FDB shows BMS at a 20.5% mark up while McKesson is showing a 25% mark up. I am assuming that they are looking at current information and I thought we took care of this several weeks ago. Ain't it Great.[78]

> Rite Aid called this morning complaining about Diamox AWP. Just wondered if you had a chance to get to it yet?[79]

> We're catching flack from our large retail friends about the Wyeth products that were sold to Barr . . . Of course, we raised the prices on both NDC's for consistency, . . . See if it makes sense to you that both NDC's should carry the new price.[80]

> Good morning . . . .

> We've had a couple of inquiries from the field asking us to correct our AWP's. J&J and one of the other wholesalers are saying that the McKesson AWP's are incorrect. We have them marked up

---

[77] MCKAWP 0068621.

[78] MCKAWP 0069586.

[79] MCK 0001168.

[80] MCKAWP 0070781.

25% like the rest of the J&J line.  When you have a minute, would you verify that our file matches the FDB file.[81]

160.    Many of the communications from First Data are also more consistent with an agreement to change AWP than an objective survey to determine what it should be.  For example, on April 1, 2002, Alisha Nielson, Kay Morgan's assistant at First DataBank, e-mailed Bob James to "please provide me with your mark-up for Endo."[82]  Bob James responded that McKesson used a 25% mark-up, and moments later, without any indication that she had received (or even requested) responses from other wholesalers, Alisha Nielson forwarded his response to her co-worker, Inna Dimitshteyn, with the instruction: "Please change the mark-up for Endo to 1.25 WAC."[83]

161.    Similarly, the following exchange between McKesson and FDB led to increased mark-ups for Lexapro and Celexa:

> [McKesson]  Question:  Is Forest's new Lexapro at 1.25?  and we still have Celexa at 1.20.  The retail customers would love to have that one changed.  Please advise.  Thank you.[84]

> [FDB] Lexapro and Celexa by Forest are still at the 1.20xW markup.  **We will change this as directed**, unless Kay objects.  I will speak with her about this.  She is in a meeting right now. [85]

162.    Soon after this exchange, Seattle-based retail pharmacy Bartell's e-mails McKesson with the subject line "Low AWP companies" to complain about a low mark-up for Galderma.[86]  McKesson responds with the subject line, "See, we listen":

---

[81] MCKAWP 0001188.  Kay Morgan responded:  "We are in sync.  Janssen still suggests [sell price] on some items and perhaps this is one but as you know Manufacturer suggested is not the same as AWP.  Don't know who is complaining (Janssen?) but FDB and McKesson match."

[82] FDB/NEC 031778.

[83] *Id.*

[84] FDB/NEC 040006.

[85] FDB/NEC 040006 (emphasis added).

[86] MCKAWP 0069819.

> Celexa and Lexapro will have an AWP markup of 25% or a spread
> of 20% as soon as FDB information is updated.  Look for a change
> to happen next week.
>
> Keep smiling[g] . . . and who said we never listen to our customers
> (and old friends).[87]

163.   Bartell's thanks McKesson and immediately turns its attention to Clarinex:

> THANKS. . . .I GUESS I HAVE STIRRED THINGS UP WITH
> THE FOREST PEOPLE . . .ALL YOU HAVE TO TELL THEM
> IS THAT WE AREN'T GOING TO STOCK LEXAPRO AND
> PUT IT ON SPECIAL ORDER LIKE OXYCONTIN.
>
> SCHERING REP CALLED AND WANTED TO KNOW WHAT
> I WAS GOING TO DO TO MOVE THE CLARITIN BUSINESS
> TO CLARINEX. . . NOT A THING, I REPLIED. . . THE
> AWP/TO COST IS MUCH BETTER ON ZYRTEC, ALLEGRA
> AND CLARITIN . . . [ellipsis added] SHE IS GOING TO TALK
> TO HER BOSS ABOUT GETTING THE CLARINEX AWP
> CHANGED.[88]

164.   McKesson responds to Bartell's that the change to Clarinex has already been

arranged:

> fyi.
>
> Schering is set up at FDB as a 1.25 vendor (meaning 25%
> markup/20% spread).  Clarinex will be moved at the next price
> increase when a new survey would be done.[89]

Again although McKesson mentions a "survey," the outcome of the alleged survey is a foregone

conclusion.[90]

165.   Similarly, in the Monthly Status Report, Rx Brand Product Management, General

Overview October 2002, McKesson reports:

> We have had some recent success in getting some AWP issues
> resolved by requesting that new surveys be done on Celexra and
> Clarinex.  Both items had AWP profitability for our retail

---

[87] MCKAWP 0069817.

[88] MCKAWP 0069818.

[89] MCKAWP 0069818.

[90] *See also* MCKAWP 0069857 (September 30, 2002 e-mail from McKesson to FDB (three weeks
after the Bartell's exchange):  "Even the Shering folks would like to see the AWP raised on Clarinex.
Last time I spoke with Chuck, I gave him the standard response about process.").

> customers.  We are working on getting some adjustments done on
> Lilly and Novo Nordisk products (insulin).[91]

And indeed it happens.  On December 3, 2002, Kay Morgan orders her assistant to change the

mark-up on E.I. Lilly to 25%.  There is no mention of a survey to instigate the change.[92]  FDB

did not produce any documents to indicate that one was ever taken.[93]  The change to Novo

followed close behind.  On December 19, 2002, Morgan e-mails James:  "FYI – Novo is going to

1.25 today.  Can't have their products at 1.2 and Lilly at 1.25."[94]

      166.    Other exchanges also demonstrate the McKesson and FDB worked closely to

change the mark-ups for brand drugs industry-wide.  For example, without any explanation, Kay

Morgan forwards to Bob James an internal First Data e-mail advising that First Data was moving

Reliant to a 25% mark-up.[95]  Also when Alisha Nielson e-mails Bob James to request a mark-up

for Enzon and copies Kay Morgan, Morgan responds before James even has a chance to answer:

> Alisha,
>
> Go ahead and put them on 1.25 times WAC.
>
> Thanks,
>
> Kay[96]

      167.    And in response to James' inquiry about whether First Data had a 25% mark-up

on some of J&J's product lines, Morgan responded:  "We are in sync."[97]

---

[91] MCKAWP 0066192.

[92] FDB/NEC 015451.  On the contrary, earlier that year Lilly had complained to FDB's CEO and COO that FDB was manipulating AWPs.  MCKAWP 0068863.

[93] *See* Morgan (2007) at 278:16-279:9 (testifying that she could not recall any other written surveys other than those produced by FDB and identified as exhibits at her deposition.

[94] MCKAWP 0069553.

[95] MCKAWP 0069782.

[96] FDB/NEC 032733.

[97] MCKAWP 001188.

- 54 -

168.    Likewise Kay Morgan responded to an e-mail from Bob James asking whether

Prilosec over-the-counter could be considered like the prescription product with a 25% mark-up:

"Thanks and we have you covered."[98]

169.    Also consistent with advancing the Scheme, McKesson conducted weekly review

of First Data's AWPs. [99]  In April 2002, James forwarded one of McKesson's comparison files to

Kay Morgan, asking her to

> let me know if you think this type of information is useful and also
> if you need additional information.  *We should be enthused about
> how good this is looking.*  Thank you for all your cooperation.  We
> can get similar information on the rest of the file that would
> include generics and OTC/Home Healthcare but for now I would
> like to focus on brand products[.][100]

Morgan replied:  "It's a start.  . . . I agree, brand comes first."[101]

170.    In another instance , James wrote of McKesson's weekly FDB AWP comparison

files:

> From the weekly data that I have been using, there are fewer than
> 100 brand items where we are not using the FDB AWP because its
> [sic] not correct.  They have the WAC and AWP as the same or
> 0.00 WAC or an old AWP that is less than our current WAC *or
> they use a different multiplier* and round down.  I have asked you
> to find out from Rite Aid if they would agree to us putting in a
> 25% markup (or 20% spread) on these items *until FDB catches
> up.*[102]
>
> I need to look at all brand Rx AWP's and not just the ones that are
> problems.  This will give me a chance to look at the big picture and
> *see what I have left to do*.[103]

---

[98] MCKAWP 0070967.

[99] MCKAWP 0042663.

[100] MCKAWP 0069617 (emphasis added).

[101] MCKAWP 0069640.  Over the course of the Class Period, McKesson forwarded several of its AWP comparison files to FDB.  *See, e.g.*, MCKAWP 0069717; MCKAWP 0070784; MCKAWP 0070826; and MCKAWP 0070928.

[102] MCKAWP 0063858 (emphasis added).

[103] MCKAWP 0069820 (emphasis added) (e-mail string between James and others at McKesson re FDB AWP comparison report).

171.    McKesson also discovered that some of First Data's AWPs were low because First Data had no data or inaccurate WAC information or none at all.  In May 2002, Bob James observed, "Most of the problem here [*i.e.* any remaining discrepancies between McKesson's suggested sell prices and FDB's AWPs] is that FDB does not have a WAC (just using 00.00[)]. We are providing them our figures and they will input them next week.  This will get us very close to being on the money."[104]  The previous month Bob James noted, "We are working with FDB to improve 'their accuracy' on WAC pricing because ours seems to be extremely accurate."[105]

172.    To correct this problem and to ensure that the mark-up changes were implemented promptly when the WAC increases occurred, McKesson decided in April 2002 to

> monitor (weekly) the items where the FDB WAC and McK WAC are different and send information to FDB to discover why.  These items should be corrected quickly once we discover the reason it is happening and correct the process if necessary.[106]

The next month Bob Roberts reported:  "Kay Morgan has agreed to use our WAC prices where they show none presently.  This is positive."[107]

**D.    McKesson Sought to Conceal its Collaboration With First Data**

173.    The implication that McKesson knew that it was not simply participating in an objective survey process with First Data is further underscored by McKesson's efforts to maintain the secrecy of its normalization plan.  This secrecy also made it more difficult to discover the Scheme.

---

[104] MCKAWP 0068889.

[105] MCKAWP 0069615.

[106] *Id*. (MCKAWP 0069616).

[107] MCKAWP 0069669.

- 56 -

174.    In a February 21, 2002 e-mail discussing McKesson's efforts to increase AWPs, McKesson's John Bonner closed with the admonition:  "I'm not sure it is something we want discussed.  Please contact him before discussing outside the company."[108]

175.    When Brian Ferreira of VPS Retail wrote to Bob James asking him to "[p]lease provide the list of items and/or manufacturers that were included in the AWP standardization process," he knew better than to respond to the request in writing:  "Brian, this is an interesting request. . . .  Please give me a call when it is convenient."[109]

176.    McKesson knew that if it did not keep its manipulations of the AWPs a secret, there would be serious repercussions:

> Confidentially.  Not to pass on.  We have [only] about 470 brand Rx items where McK and FDB AWP's do not match. . . .[110]

> [Bob James, discussing McKesson's efforts to raise AWPs:]  For obvious reasons we don't want to write a memo and send it out because it would not be kept confidential.[111]

> [James, responding to McKesson field associate's request to share information about McKesson's efforts with her customers:]  I would be careful . . . . . You be the judge on how your customer will interpret.[112]

> [McKesson field associate writing to John Bonner:]  My accounts are having issues with us 'Normalizing brand pricing at 25%' . . . .  You also mentioned that we should not discuss [this] outside of McKesson, how would you suggest we answer our customers['] questions?[113]

> [McKesson field associate, discussing McKesson's "normalization plan":]  Obviously this is not out to the field.[114]

---

[108] MCKAWP 0066464.
[109] MCKAWP 0069714.
[110] MCKAWP 0068889.
[111] MCKAWP 0069591.
[112] MCKAWP 0069592.
[113] MCKAWP 0066464.
[114] MCKAWP 0069732.

[James, signaling to McKesson employees that they should not state in writing that McKesson changed its markups to improve its customers' profitability:]  Remember, **"McKesson is doing this to improve our inefficiencies in our BIS group."**  With mixed AWP spreads, our BIS group is required to make manual overrides (for our pricing activity) to input the First Data Bank AWP whenever there is a difference from our Suggested Sell or List Price.  It could be stated as a benefit of the Sixth Sigma method of identifying defects.  An "unintended consequence" is that the profitability of our customers will be impacted in a positive way.  They will basically get 3⅓% more profit on Rx's filled with this new AWP spread.  (Just imagine what this would mean on drugs like Lipitor or Prilosec.) [boldface in original][115]

177.    And First Data also knew the importance of keeping the Scheme a secret.  In response to an e-mail inquiry about whether electronic drug pricing publishers were increasing the WAC-AWP spread, Kay Morgan denied any involvement and brandished the false "survey" defense:  "I am most curious as to the source of this rumor.  First Data has always used a wholesaler survey to determine AWP."[116]  She forwarded the exchange to Bob James at McKesson, stating, "I thought you might want to see my answer," to which he responds:  "I love it!  You are the best."[117]

178.    Evidence also suggests that McKesson and First Data agreed, whether explicitly or implicitly, to perpetuate the myth of the objective survey process as a means of covering their Scheme.  For example, after FDB had already agreed to raise the mark-up on Schering products,[118] McKesson forwarded the e-mail from Schering asking for McKesson's help in raising FDB's mark-up on Clarinex so that it could remain competitive with Claritin[119] – another of the drugs that were increased as a result of the Scheme:  "Even the Shering folks would like to

---

[115] MCKAWP 0065895 (emphasis in original).

[116] MCKAWP 0069588.

[117] *Id.*

[118] *See* MCKAWP 0069818.

[119] MCKAWP 0069857.

see the AWP raised on Clarinex.  Last time I spoke with Chuck, *I gave him the standard response about process.*"[120]

179.     And publicly, throughout the 2001-2005 period, FDB falsely represented that its surveys were "performed with all national wholesalers to determine the appropriate AWP."[121]

**E.     McKesson Benefited From the Scheme**

180.     McKesson benefited from the Scheme because it was able to demonstrate to its customers its willingness to create an environment of greater pharmacy profits.  McKesson anticipated that the Scheme would ensure customer loyalty and possibly increase its customer base, and, in fact, McKesson did maintain and increase its customer base.

181.     McKesson's customers included the largest retail chains in the country:  A&P, Albertsons, Brooks, Costco, Eckerd, Giant Eagle, Hy-Vee, Kinney Drugs, Long's Drugs, Rite Aid, Safeway, Randall's Shopko, Snyder's, Spartan, Super D/USA Drug, Target, Wal-Mart, Walgreens, and Wegmans.[122]

182.     Like most wholesalers, McKesson sold drugs at or below its own cost, and McKesson recognized that it could distinguish itself from other wholesalers by providing an enhanced relationship with customers.[123]  Although McKesson and First Data knew the importance of keeping their activities confidential, McKesson also realized that it could "'market' [its] efforts" by carefully informing its customers that it was "doing everything possible to 'raise' AWP's when appropriate."[124]  McKesson also appreciated that, if it failed to inform its customers that it was behind all these changes, "it's possible that some of these

---

[120] MCKAWP 0069857.

[121] *See, e.g.*, FDB-AWP 02023; FDB-AWP 02005.

[122] MCKAWP 0074408.

[123] *See* John Bonner Dep. at 12:20-23 (acknowledging that wholesalers sell at or slightly below cost).

[124] MCKAWP 0065895.

accounts will believe that this stuff just happens and our efforts will go unrecognized."[125]  As

another McKesson executive put it:  "This sounds like something we should at least [be] quietly

communicating to our customers in order to get some mileage from it[.]"[126]  Greg Yonko

concluded:  "I also think we should start communicating any AWP changes so customer[s] know

what's going on, the end result should be beneficial."[127]

>    183.    And so it began:
>
> > [To Bartell Drugs:]  Celexa and Lexapro will have an AWP
> > markup of 25% or a spread of 20% as soon as FDB information is
> > updated.  Look for the change to happen next week.  Keep
> > smilin[g] . . . and who said we never listen to our customers (and
> > old friends)."[128]
> >
> > [To Bartell Drugs:]  Just wanted you to know that Clarinex AWP
> > spreads went to 20% this week.  A few weeks ago Celexa went to
> > 20% as well.  Fat cat status is just around the corner.")[129]
> >
> > [To Rite Aid:]  P.S. latest AWP changes . . . Celexa and Clarinex,
> > working on Lilly and Novo.[130]
> >
> > [To various individuals, not identified by pharmacy:]  "I am told"
> > that the mark up on Avonex and both the old and new sku's of
> > Copaxone will be changed to 25% (to create a 25% spread on
> > WAC/AWP) next week. . . . . Yes!! . . . . This should have a
> > significant contribution to your profitability as illustrated by the
> > following example using a reimbursement of AWP – 15% plus
> > $2.00 fee:
> >
> > Avonex at 16⅔% spread, profit would be $18.42 . . . and now at a
> > 25% spread, profit would be $51.31 . . . not bad!  This is an
> > increase of $32.89 per script.
> >
> > Copaxone at 16⅔% spread, profit would be $19.72 . . . an now at
> > 20% spread, profit would be $57.39 . . . pretty good!  This is an
> > increase of $37.67 per script.[131]

---

[125] *Id.*

[126] MCKAWP 0069732.

[127] MCKAWP 0084300.

[128] MCKAWP 0069817.

[129] MCKAWP 0069901.

[130] MCKAWP 0069911.

[131] MCKAWP 0084327.

184.    A field agent reported that customers were beginning to understand McKesson's efforts:  "Some of the more sav vy  [sic] stores like Med-X have taken notice."[132]

185.    Bob James realized that the goodwill McKesson established with the pharmacies as a result of inflating AWPs would give it a substantial edge over its competition:

> In my discussions [with select customers about McKesson's efforts to "normalize" the AWP markup at 25%], one of the comments that was made was "this would certainly be a good reason to renew our agreement with McKesson when its time."  Talk about being good partners, wow!  This is worth further discussion as we go forward.  Maybe a proactive strategy like this will soften some of the activity around asking for lower costs and more benefit.[133]

186.    James proposed disclosing McKesson's efforts to customer Omnicare who purportedly was looking for an extra-contractual year-end bonus in the neighborhood of $500,000:

> Omnicare is looking for . . . . . . say $500,000 in benefit from year end deals, even though this was not part of their contract.  We need to ask them to roll up or recalculate their reimbursements for last year based on the new AWP's with a 20% spread.  And . . . . . . this is **not just a one time benefit**.  They will receive this now and for each year going forward until they renegotiate their contracts with third parties (and hopefully do not give up this gift).[134]

187.    James also noted with pleasure that Kay Morgan spoke "with Eric Sorkin at RiteAid to let him know how much effort we are putting into this AWP thing to get it right."[135] Other customers were also appreciative, for example an unnamed customer from Ohio, who called McKesson "to say that he was looking at some of these items again and found that the spread appears to have increased significantly on most of these items to the area of 20-21%.  He

---

[132] MCKAWP 0069732.

[133] MCKAWP 006589.

[134] MCKAWP 0065895 (emphasis, ellipses in original).

[135] MCKAWP 0069669.

wondered if we had any part in doing this and, if so, he wanted to let us know that he really appreciated our efforts."[136]

188.    Med-X Corp.'s Director of Operations, Jerry Howard, reviewed the numbers, put two and two together[137] and "was very ex[c]ited about" McKesson "working on AWP expansion."[138]

189.    These internal comments are consistent with the 2007 public statements of McKesson CEO and President John Hammergren, which emphasize that, while McKesson wishes to help its retail customers, it only seeks to do so when that help is mutually beneficial:

> As to all of their [pharmacies'] pressures effect on McKesson, all of those [Medicare Part D] things are outside of our scheme. We don't use AWP or AMP or PDP negotiated prices. Our contractual relationships with our customers are independent of those mechanisms. So to the extent that they are hurt, clearly, they can come back to us and say we would like to have you help us with our margin pressure. And although we're sympathetic to those plights, they've been asking us to help them with their margin pressures for 30 or 40 years. We would have already caused to exist if we had helped them with their margin pressures over the years. So I think that's more of a market competitive issue for McKesson as to how we would respond, as opposed to whether or not they're going to ask us for a better deal. We're asked about a better deal all the time by our customers, and our sales forces and our management teams are trained to only provide better deals if it's a better deal for McKesson and there's some way to for us to get a win-win out of it, as opposed to gee, I feel your pain; why don't you take part of my margin?[139]

190.    Of course, increasing AWPs in collusion with First Data was a "win-win" proposition for McKesson, because it rewarded McKesson's retail customers <u>without</u> costing McKesson. Instead, reimbursers and patients all around the country would pay the increased costs of the Scheme.

---

[136] MCKAWP 0069513.

[137] MCKAWP 0069732.

[138] MCKAWP 0069726.

[139] McKesson Corporation at the Goldman Sachs 28th Annual Global Healthcare Conference, *Fair Disclosure Wire* (June 13, 2007).

191.    In an internal document dated February 3, 2004, McKesson bragged that it maintained its status as the market share leader by retaining "100% of its key RNA [retail national accounts] base," winning "2-3 new big customers," capturing "30% of regional chains" and expanding its "#1 position" among wholesalers.[140]

192.    Although McKesson never mentioned the Scheme or the benefits McKesson derived from it in public filings and other representations to the investing public, McKesson did acknowledge that it benefited from price increases for brand drugs.

193.    In an earnings conference call in the first quarter of 2003, McKesson's CEO John Hammergren stated that McKesson's "gross margin expansion is being driven a little bit now by price increases on branded products and if those price increase trends stay the way they are, we could very well see gross margin expansion, as well."[141]  Three months later, during a second quarter 2003 earnings conference call, Hammergren stated:

> You know, we continue to see a nice drug price inflation, probably in the 4-and-a-half to 5-and-a-half percent kind of range, and certainly as strong as it was in the prior fiscal year.  We continue to find ways to leverage our customer base to get margin opportunities for the manufacturers, and we're very positive about the way it looks for the balance of the year.[142]

McKesson continued to report the positive effect of price increases for another year.[143]

## F.    McKesson's Internal Documents Admit the Long-Term Effects of the Scheme

194.    While the Scheme was still in its infancy in September 2001, McKesson realized that it would have a profound effect on its customer's profitability:

---

[140] MCKAWP 0074404 at 74410.

[141] *See* July 23, 2002 Fair Disclosure Wire article.

[142] *See* October 21, 2002 Fair Disclosure Wire article.

[143] *See* January 21, 2003 Fair Disclosure Wire article, Event Brief of Q3 2003 McKesson Corporation Earnings Conference Call (describing "this solid pricing environment" and stating "[t]he pricing levels were above 5%.  We feel strongly those products are protected and have good market share and price increases."); July 24, 2003 Fair Disclosure Wire article, Q1 2004 McKesson Corporation Earnings Conference call (stating that "drug price increases continue to be robust").

> In August we were able to get the Concerta (formerly an Alza
> product now JOM) AWP spread raised to 20% from the previous
> 16 ⅔% [i.e. an increase in the markup from 20% to 25%].  Last
> week we got agreement with First Data Bank on raising the Searle
> Products, which are now part of Pharmacia, to a 20% spread as
> well as Genotropin which was a Pharmacia product (with a 16 ⅔%
> spread).  This may not seem like a big deal but it has a huge
> positive impact on the profitability of our customers.[144]

195.    Clearly, if McKesson had believed that the increases were only short-term, it

would not have bragged about a "huge positive impact on the profitability of our customers."

And in the previously cited e-mail from January 2002, Bob James confirmed this when he

explained that McKesson expected their customers to hold onto the "gift" of the increased mark-

ups well into the future:

> A couple of years ago I was pulled into a conference call with
> Steve somebody (I think) and our McKesson MHS sales person,
> about how we were hurting them with our AWPs.  He came on
> very strong and was going to call John Hammergren, etc.  We
> calmed him down by explaining our process and tried to make him
> understand that we were really their advocates and were doing
> everything possible to "raise AWP's when appropriate.  I haven't
> heard anything since."
>
> Here is an idea.  Two years later, and having had some recent
> success in raising AWP's, I think this could be presented to him
> positively in this way:
>
> Omnicare is looking for . . . . say $500,000 in benefit from year
> end deals, even though this was not part of their contract.  We need
> to ask them to roll up or recalculate their reimbursements for last
> year based on the new AWP's with a 20% spread.  And this is **not
> just a one time benefit.**  They will receive this now and each year
> going forward until their renegotiate contracts with third parties
> (and hopefully do not give up this gift).[145]

Similarly, James' April 2003 memo stating that "We played a major role (and still do) in

normalizing the AWP's on Brand Pharmaceuticals" also confirms the profound impact of the

Scheme:

---

[144] MCKAWP 0065885 (September 18, 2001 e-mail from Bob James to Greg Yonko).

[145] MCKAWP 0065895 (January 7, 2002 e-mail from Bob James to Greg Yonko, *et al*.) (emphasis in
original).

> This has had a huge impact on the profitability of our customers on their insurance based business (which is about 90% now). To summarize this impact, it's the same as lowering their cost of goods 3 ⅓% on 70% of the brand drugs. Historically, 75% to 80% of brand pharmaceuticals carried a 16 2/3% AWP spread and the remaining, a 20% spread. Today, almost 95% of brand drugs carry a 20% spread. This has provided millions of dollars in improved profits across our industry.[146]

196.    As many as ***three years*** after the Scheme was implemented, McKesson employees were still internally congratulating each other about its success.

197.    For example, in a July 30, 2004 e-mail, McKesson's John Bonner acknowledged the Scheme's impact on payors and the corresponding benefit to McKesson's clients:

> We try to "push" the AWP up to 25% above WAC rather than 20%. This may cause your customer some short term reimbursement pain with the payors but in the long run, if AWP at First Data Bank goes from 20% to 25%, your customer will benefit.[147]

> Most payors reimburse pharmacies at AWP minus 15 to 17%. **The higher AWP markup percentage, the more they are paid by the insurance company.** Pharmacies barely break even on items with 20% AWPs.[148]

198.    Again in July 2004, McKesson was calculating how much the price increase at Johnson & Johnson had earned one of their clients: "Please see below for the work up of what the impact has been for Omnicare on JOM products relative to the change in AWP spread. Three years ago J & J products were all 16 ⅔% AWP spread products. Today, almost all of them are 20% spread. Procrit just changed last month."[149]  McKesson concluded that, for Procrit alone, profits tripled, and taking all JOM products together, the effect is "***more than 3 times the profit as before***."

---

[146] MCKAWP 0065592.

[147] The "customer" here is a McKesson retail client.

[148] MCKAWP 0076289 (e-mail string, including July 29, 2004 e-mail from John Bonner to Benjamin Coppolo).

[149] MCKAWP 0068131-32 (e-mail string, including July 28, 2004 e-mail from Bob James to Andrew Stubbs, *et al.*).

199.    Similarly, in April 2004, when writing to a manufacturer to decline its request to

set the mark-up for its products at 20%, James explained:

> [T]hings have pretty much normalized at a 20% spread (1.25
> markup) for Brand Rx, which has been extremely beneficial for
> our customers. . . . .  Why do you want to take the profitability
> away from the retail pharmacies by trying to use a spread of
> 16 ⅔% when almost all other companies are getting a 20% spread.
> If you have any doubts about what I am saying, please contact
> Scott Johnson at Albertsons, Dave Vucurevich or Greg Drew at
> Rite Aid, Frank Seagraves at Wal Mart, or Frank Scorpiniti at
> Longs.[150]

That McKesson was touting its benefits to Albertsons, Rite Aid, Longs and Wal-Mart in 2004

underscores the evidence that the Scheme had long term effects on end payors.

## G.    Evidence from Manufacturers Also Confirms the Existence of the Scheme and the Impact on the Market

200.    The McKesson-First Data Scheme is corroborated by evidence from

manufacturers.  For example, an internal memo from Johnson & Johnson ("J&J") from May 15,

2002, titled "Wholesaler manipulation of AWP" stated:

> At a recent McKesson meeting Greg Yonko confirmed that
> McKesson was changing average selling price to reflect a higher
> spread on AWP. . . . McKesson is implementing the change after
> companies implement a price increase. . . . . Amerisource and
> Cardinal have indicated that they are NOT implementing the same
> strategy.  It is safe to assume that if McKesson is successful and
> the change in AWP is reflected in First Data Bank and Red Book,
> then ABC and Cardinal will follow.[151]

201.    Other J&J documents also recognize that the Scheme caused artificial increases

for end-payors, while increasing pharmacy profits:

> It has come to our attention that pricing services such as First
> DataBank are now adjusting our recommended AWP's based on a
> WAC + 25% formula.  The result is a win for providers
> (pharmacies) since their reimbursement from Medicaid is

---

[150] MCKAWP 0071694 (April 20, 2004 e-mail from Bob James to Chad Lucero).

[151] MDL-OBI00002828-39; *see also* MDL-OBI00040610-15 (May 13, 2002 J&J e-mail with attachments showing that ABC, Cardinal and McKesson each had 20% mark-ups for Procrit and Epogen, but noting "Bob James confirms that AWP for both PROCRIT and Epogen will be moving to cost x 1.25 in the near future.").

increased.  The state pays more and there is additional pressure on
the industry as a whole because state expenditure for drugs will
increase.  This is an artificial price increase and setting of the AWP
is out of our hands.[152]

202.    J&J drafted an internal memo in which it addressed First Data's unauthorized

increase of J&J's mark-up to 25%.  It observed:

> Since AWP is the basis for reimbursements in many segments, this
> action will increase the strain on multiple payers.  The inflated
> AWPs would benefit pharmacies under Medicaid payment
> procedures and since AWP is the primary basis of Medicaid
> reimbursement, the impact to states could be significant.
>
> *  *  *  *
>
> When probed by various J&J contacts, FDB provided
> contradictory responses . . . ranging from: the use of survey
> methods and techniques have not changed: the data is what it
> is. . . . to the other end of the spectrum . . . . it was a deliberate
> action:  "J&J will be a +25% company" as would other 20%
> companies to standardize data collection and reporting
> requirements on FDB.  There was not much detail provided
> regarding survey techniques.  J&J trade relations believe the major
> wholesalers are surveyed and two out of the three majors would be
> enough to change the price point.  From a wholesaler perspective
> the theory exists that this would be a way to enamor themselves
> with the retail pharmacies, as greater profits would be realized by
> the pharmacists.[153]

203.    A Bristol Myers Squibb presentation also observed the changes, but assumed that

it was all First Data's doing:

> First Data Bank has changed the way they create AWP.  In the
> past, some manufacturers list prices was marked up 20.5%, others
> 25% based on the product labeler code.  Now, concurrent with
> price increases, 25% mark-up is being applied, regardless of
> historical precedence.[154]

204.    The same is true about AstraZeneca, which observed:

> Recently, FirstDataBank [sic] has independently begun to revise
> the AWP for all branded pharmaceutical products to a 25%
> markup.  We have been informed that FirstDataBank [sic] is taking

---

[152] MDL-JJ00000110.

[153] MDL-CEN00103686 (Ortiz exhibit 001).  Ms. Ortiz testified that the memo represented a
summary of her research into the question of the AWP reporting issue.  Ortiz Dep. at 88:14-20.

[154] BMS/AWP/01109780.

this action to create consistency in price reporting. For AstraZeneca products with a 20% spread, the spread will increase to 25% at the time of the WAC price change, beginning on January 1, 2002, or by the end of the 1st Qtr 2002, even if price change was not changed. We have seen the change to AZ and other companies' products that had price changes in 2002.

**How the spread changes could impact the industry and healthcare system**

- Price perceptions – AWP is sometimes used to compare prices so a higher spread appears to inflate the prices of pharmaceutical products. As an example, the new AWP price for Nexium 40 mg capsules is $4.32 – it would have been $4.14 without the spread changes.

- Pharmacy reimbursement – a higher spread can translate into higher reimbursement to retailers and mail order pharmacies to the extent a reimbursement formula for private third party and Medicaid RX's is anchored off of AWP.

* * * *

- Price comparisons – since AWP is sometimes used to compare the prices of competing products the change in spread will cause price differences to appear greater or lesser depending on the specific situation. . . . However, according to FirstDataBank [sic] the spread for all branded drugs will be changed to 25% by the end of the 1st Qtr 2002.[155]

205.   First Data kept the ruse alive when it told Aventis that wholesalers were driving the changes:

First DataBank has advised me that after surveying the wholesalers, they feel that there are very few manufacturers that still have a 20% AWP to AWC spread. As a result First DataBank has determined to employ a higher 25% AWP to WAC spread for all Aventis products. This will be implemented as we have price changes. Immediately the entire line of Allegra will be moved to a 25% spread from its current 20%. This will be effective immediately. The most noticeable will be that it will be more profitable for the retail pharmacist to dispense Allegra.[156]

---

[155] AZ 00461109 (Freeberry, Exhibit Q, identified, Freeberry Dep. at 114:14-19).

[156] AV-BCA-0010336.

- 68 -

206.    Although they ultimately did nothing about it, many of the manufacturers objected to the increases.[157]

**H.    The Other Major Wholesalers – Amerisource Bergen and Cardinal – Declined to Manipulate AWP or Participate in any Scheme With First Data**

    **1.    While Cardinal and ABC faced the same pressures as McKesson to increase profit margins for their pharmacy customers, they did not manipulate AWP**

207.    Although wholesaler prices are based on WAC, not AWP, wholesalers maintain AWPs for their customers' benefit to allow them to calculate their reimbursement.[158]

208.    But even though other wholesalers like ABC and Cardinal provided AWP information to their customers, they refrained from engaging in any scheme with First Data or otherwise manipulating pricing data.

    **a.    Cardinal**

        **(1)    Where possible, Cardinal set its "Reference Price" based on what manufacturers told Cardinal**

209.    Like McKesson's Suggested Sell Price, Cardinal has a sell price in its "Master Item File" or "MIF" database called Cardinal "Reference Price."

210.    Unlike McKesson, which revised its Suggested Sell Price without regard to manufacturer suggestion in order to increase First Data's published AWPs, Cardinal always relied on the manufacturer suggested price or historical mark-up and applied a default mark-up only if it had no mark-up information.

---

[157] *See, e.g.*, MDL-OBI00002617 (J&J); Deposition of John Freeberry (May 20, 2004) at 118:11-120:18; 125: 7-15 (AstraZeneca). FDB-AWP 053695 at FDB-AWP 053697(GlaxoSmithKline); *see also* MCKAWP 0068863 (Morgan e-mail to James, dated April 30, 2002: "ARGHH!!!!! Lilly told our CEO and COO we were setting AWP.").

[158] *See, e.g.*, MCKAWP 0084291 ("Regardless of where product management says the customer should get the AWP, the fact of the matter is that a lot of them I am sure use the AWP from our system for reimbursement. And yes, this [discrepancies between McKesson's list prices and what the vendors or FDB list as the AWPs] would definitely be a problem.").

**(2)    Cardinal ensured that its AWP Reference Price would not be confused with FDB's AWPs**

211.    Cardinal took pains to ensure that its Reference Price was not confused with actual published AWPs.  Historically, Cardinal published a "Corporate AWP" or "Cardinal AWP."  In approximately 2000, Cardinal began reconsidering the label "Corporate AWP" because the field was based on vendor information, not a calculation of an average, as the name "AWP" suggested.

212.    Cardinal decided to call its sell price "Reference Price" because it did not want to be presumed to be a party that sets AWPs.

**(3)    Cardinal never responded to First Data "surveys"**

213.    Cardinal was largely unaware of First Data's wholesaler surveys until about 2000. An internal Express Scripts document from 2002 reflects that representatives from Cardinal told employees at Express Scripts that they believed First Data surveyed three wholesalers: McKesson, AmerisourceBergen, and D&K.[159]

214.    It has been Cardinal's policy since at least 1998 never to share its pricing information with third parties, including First Data.  Thus, Cardinal not only refused to participate in First Data's "surveys," but, other than forwarding manufacturer price announcements, also refused to provide First Data pricing information at all.

215.    Cardinal's policy of non-disclosure was well-enforced.  Cardinal was aware of only a single instance in which a Cardinal employee had provided AWP information to First Data.  After that incident occurred, the employee was instructed never to do so again, and Cardinal held a meeting at which this message was conveyed.

---

[159] ESI-414-00004275.

216.    Notes from an internal First Data meeting on June 7, 2000 – over a year before the Scheme began – confirm that Cardinal informed First Data that it did not want to take part in its survey:

> Steve is saying that Cardinal didn't want to participate in [FDB's] survey.  Kay [Morgan] wants to continue to include Cardinal. . . . Doesn't know if they want to be in the position of setting AWP [in case] Cardinal heard back from their customers that they are setting the wrong AWP.[160]

The notes also identify as First Data's contact for Cardinal the same Cardinal employee who was rebuked for violating Cardinal's policy of disclosing unpublished pricing information.[161]

217.    Although Kay Morgan could not recall when it occurred, she conceded that Cardinal asked her to stop calling about pricing information.[162]  She further conceded that the only mark-up information that she received from Cardinal after that point was limited to instances in which there was a product that Cardinal wanted listed that was not carried by any other wholesalers.[163]

218.    FDB's document production further undermines its contention that it relied on Cardinal's involvement in the survey process.  FDB produced three written surveys which purport to show Cardinal involvement.  All three pre-date the August 2001 start of the Scheme.  Two are dated in April 2000, within a few months of the FDB meeting in which the errant Cardinal employee is identified as FDB's contact from Cardinal and in which it is conceded that Cardinal does not want to participate in FDB's surveys.[164]  A third is dated May 14, 2001, three months before the Scheme began.  However, in this latter document FDB's third person

---

[160] FDB-AWP 028338 at 28340.

[161] *Id*. at 28338.

[162] Morgan 2007 Dep. at 49:4-6.

[163] *Id.* at 55:8-58:1.

[164] FDB/NEC 018527; FDB/NEC 018521, compare FDB-AWP 028338-42 (FDB meeting notes).

- 71 -

reference to Cardinal, *i.e.* "Cardinal - uses manufacturer suggested AWP" stands out in contrast with its second person references to Bergen and Amerisource, *i.e.*, "Bergen – Use AWP provided by Lilly, let us know if you think we should reconsider this," and "Amerisource – Unusual. We have 1.20 for 00002, but the NDCs in question are 1.25."[165]  FDB's use of the third-person to describe Cardinal's position suggests that it is not referencing Cardinal's personal response to the May 2001 survey, but rather representing what it understood to be Cardinal's pricing policy.

219.     This attempt to include Cardinal's pricing policy as part of the AWP calculation was inconsistent with Cardinals' clear intention that it did not want to take part in the survey or otherwise influence AWP pricing.  And even Kay Morgan conceded that she continued to try to call Cardinal for mark-up information even after she had been asked not to call, which is inconsistent with her professed belief that she had clear instructions from Cardinal as to how to use their input in a wholesaler survey.[166]

220.     The testimony of Alisha Nielson, who, with Kay Morgan, was solely responsible for updating First Data's mark-up database, is also consistent with Cardinal's lack of involvement.[167]  While she testified that First Data "looked to Bergen, Cardinal and McKesson" in the 2001-2005 period for mark-up information,[168] Ms. Nelson admitted that she did not know whether First Data had any contacts at Cardinal for wholesaler surveys in this period.[169]

221.     Thus, First Data was not surveying Cardinal, one of the "Big Three" wholesalers, at any time during the Scheme.

---

[165] FDB/NEC 015320.  There is no verb and thus no reflection of person in FDB's reference to McKesson, *i.e.*, "McKesson – 1.20."

[166] Morgan Dep. 2007 at 287:7-289:2.

[167] Nielsen Dep. at 53:7-19; 60:5-8; 131:5-19.

[168] Nielsen Dep. at 70:11-17.

[169] Nielsen Dep. at 165:10-24.

        **(4)    Cardinal refused to respond to customer pressures to raise its mark-up**

222.    Nor did Cardinal otherwise manipulate prices.  In October 2002, Cardinal sales representatives were complaining that their customers were concerned because the AWPs Cardinal listed were lower than the AWPs listed by its competitors, yet Cardinal refused to become involved in any price manipulation.  Similarly, documents from the PBM, Express Scripts, indicate that when Cardinal was approached by a pharmacy and asked to increase its mark-up, Cardinal refused to do so.[170]

223.    Even when Cardinal received calls from customers after the Scheme had taken effect, it maintained its pricing policy.

        **b.    AmerisourceBergen**

        **(1)    AmerisourceBergen based its AWPs on manufacturer information and, when that source dried up, on First Data's AWP**

224.    ABC was the product of an August 2001 merger of AmeriSource and Bergen Brunswig.  The AmeriSource legacy company used a formulation called "AAS AWP," which was similar to McKesson's Suggested Sell Price, and Bergen's legacy company had one called "BBCWP."

225.    ABC utilized the historical mark-up because it believed AWP should be standardized throughout the industry.

226.    When AmeriSource and Bergen Brunswig merged to form ABC, ABC conducted a reconciliation to ensure that all of its AWPs, and the methods by which they were calculated, were the same.  Although ABC found it difficult to manually enter AWP changes,  ABC never considered standardizing all of its mark-ups in order to make the process easier.

---

[170] *See* ESI-414-00004275; *see also* ESI-414-00003844.

## (2)    ABC never responded to First Data "surveys"

227.    ABC is not aware of anyone ever being surveyed by First Data, responding to surveys, providing any type of pricing information to First Data, or providing First Data with ABC's method for calculating its proprietary AWP.[171]

228.    Similarly, there are no FDB survey documents from any time during the Scheme purporting to show ABC (or its predecessors, Bergen and Amerisource) participating in the survey process.  Alisha Nielson conceded that during the merger, acquisition, and subsequent layoffs of ABC employees, FDB was not getting sufficient information from ABC.[172]

229.    In October 2003, First Data held a conference call with ABC, hoping to convince ABC to participate in FDB surveys, but was unsuccessful.[173]

## (3)    Despite pressure from its customers to raise its mark-up, ABC adhered to manufacturers' historic mark-ups

230.    Like Cardinal, ABC, too, faced pressure from its customers to raise its AWPs. Nonetheless, ABC never considered using a standardized mark-up of its own choosing.

231.    Even after the Scheme took effect, ABC resisted adopting First Data AWPs for years.

## I.    Fraudulent Concealment and Continuing Violation

232.    The conspirators cleverly hid their conduct behind FDB's confidential survey process to avoid detection and to preserve for as long as possible the benefit they had conferred to the pharmacies.  Additionally they made affirmative misrepresentations about their role in the Scheme, including without limitation, falsely attributing mark-up increases to the wholesaler

---

[171] Affidavit of Denny Lindell (Mar. 1, 2006) (describing results of investigation).

[172] Nielson Dep. at 96:11–97:8.

[173] Morgan at 242:4-243:1; *see also* FDB/NEC 032851; *see also* FDB/NEC 032852-53 (internal FDB e-mail, dated September 15, 2004, discussing FDB's negotiations with ABC to provide pricing data).

- 74 -

industry as a whole, as opposed to McKesson's secret normalization agenda.[174]  FDB continued

to make false or misleading statements about the integrity of its data and the means by which it

calculated its AWPs.[175]   FDB also kept McKesson's participation in the process secret by

refusing to disclose the alleged survey results on alleged grounds of confidentiality.[176]

Additionally, when asked directly whether First DataBank was in the process of normalizing

mark-ups, First DataBank not only denied this and demanded to know the source of this

"rumor," but forwarded its response to McKesson's Bob James, who responded:  "I love it!

You're the best."[177]  Similarly, in a conference call with Aetna, McKesson denied that it had any

control over rising AWPs,[178] while at the same time it bragged to select customers that McKesson

had "done [its] part" to increase AWPs through increased mark-ups. [179]  Nor did McKesson

publicly reveal its normalization scheme, knowing that if the increases were revealed, managed

care would renegotiate with retail pharmacies and McKesson's "gift" to retailers would be lost.[180]

---

[174] *See, e.g.*, AVA-BCA-0010336.

[175] For example, FDB-AWP 02005 (page from FDB's website, dated November 4, 2002) (stating that FDB surveys each of the national wholesalers to determine mark-up), which Kay Morgan acknowledged was never a true statement of FDB's survey practice.  Patricia Kay Morgan 6.28.07 Dep. at 100:16-23.

[176] *See, e.g.*, FDB-AWP 053695 at FDB-AWP 053697 (March 1, 2002 letter from GlaxoSmithKline complaining of the mark-up increases: "First DataBank has not been willing to share any information regarding that survey or to disclose any other data that might form the basis for this change in the formula.  We were informed that First DataBank considered the data to be proprietary.  We were also told by certain of your personnel that, because First DataBank alone sets AWP, we had no standing to request an explanation from First DataBank for the extent of these increases in AWP."); Freeberry  Dep. (May 20, 2004), at 114:18-24 (regarding AstraZeneca's efforts to address FDB's unauthorized increases of its mark-ups: "Q:  Have you ever reviewed any of the wholesaler surveys that First DataBank purportedly did?  A:  I asked for them; they weren't provided.").

[177] MCKAWP 0069588.

[178] MCKAWP 0078652.

[179] MCKAWP 0065895.

[180] MCKAWP 0065895.

233.    The effects of the Scheme were further obscured because First Data stored its mark-up information separately from its database of published prices and generally increased the mark-up on individual drugs only when the manufacturer announced a change to the WAC.[181]

234.    It was McKesson and FDB's standard practice to delay the implementation of the mark-up increase until the WAC prices were published and both changes would take place at once.  For example, when Bob James e-mailed FDB to ask Kay Morgan if she would "check the AWP for Remicade," Alisha Nielson responded:

> Hi Bob,
>
> They (Centocor) are a 25% company.  However, they have not had any price changes on this Remincade product since 2001. . . prior to the markup.  I'll bring this to Kay's attention.  Not sure if . . .[she] would want to take action on it right now because it would trigger a lot of questions on why there was a change to the item when the MFG hasn't sent any price changes.
>
> Have a wonderful day!
>
> Alisha Nielson[182]

235.    Because the artificial mark-up increases were taken at the same time and overshadowed by the manufacturers' published WAC increases, most payors were unaware of any mark-up increases and attributed the overall increases to manufacturer price hikes.

236.    Finally, in a March 15, 2005 letter, First Data announced that its purported survey method of determining AWPs would be discontinued, but it did not disclose the Scheme or otherwise inform the public that its AWPs were the product of manipulation by FDB and McKesson.  On the contrary, reviewing its past practices with respect to establishing AWP, First Data restated that it had conducted surveys to establish AWPs:

---

[181] Alisha Nielsen at 84:16-85:3; 158:2-7; *see also* MCKAWP 0069609 (explaining the delay between the change in mark-up and when it takes effect with the announcement of price changes).

[182] MCKAWP 0071440.

March 15, 2005

**Re: First DataBank's Blue Book AWP Data**

Dear Customer:

It is our pleasure to serve you as a customer of First DataBank. We are writing to make you aware of upcoming changes to First DataBank's National Drug Data File Plus™ database, or NDDF Plus™, that may impact your use of our products.

In order to publish various drug pricing data fields available through its NDDF Plus database and related products, First DataBank has historically relied on drug manufacturers and wholesalers to report or otherwise make available information concerning their list price for drugs. Unfortunately, First DataBank is no longer able to obtain information relating to list prices directly from wholesalers in a manner that is consistent with First DataBank's editorial standards and policies. In fact, it is our understanding that some wholesalers often do not use catalog or list prices as a basis for determining actual transaction prices. As a result, First DataBank must implement certain changes to its publication of the "Blue Book AWP" pricing data field. Effective immediately, First DataBank will no longer survey drug wholesalers for information relating to their catalog or list prices.

First DataBank historically relied upon wholesalers to provide information relating to their catalog or list prices for purposes of publishing the Blue Book AWP data field. ***First DataBank periodically surveyed full-line national wholesalers to determine the average markup applied to a manufacturer's line of products. The average markup of the wholesalers responding to the survey was applied against the Wholesale Acquisition Cost (the manufacturer's list price to wholesalers, also commonly referred to as WAC)*** or, if a Wholesale Acquisition Cost was not available, the Direct Price (the manufacturer's list price to non-wholesalers), with the resulting value populating the Blue Book AWP field. In certain instances, wholesalers would accept a manufacturer's suggested wholesale price, in which case the Blue Book AWP and Suggested Wholesale Price data fields would reflect the same value.[183]

237. Plaintiffs had no knowledge of the combination and conspiracy alleged herein or of any of the facts that might have led to the discovery thereof in the exercise of reasonable diligence prior to 2008.

---

[183] MCKAWP 0054057.

238.    Plaintiffs could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and secrecy employed by McKesson and its co-conspirator First DataBank to avoid detection and their affirmative concealment of such violations.

239.    As a result of the active fraudulent concealment of the conspiracy, Plaintiffs assert the tolling of the applicable statute of limitations affecting the causes of action by Plaintiffs. Moreover, McKesson's actions constitute a continuing violation because each and every purchase of drugs at artificially inflated prices is an overt act that injured Plaintiffs. These artificially inflated prices continue to exist because McKesson has failed to disclose its illegal conduct and its effect on the prices paid by Plaintiffs for brand-name drugs. In addition, McKesson committed numerous overt acts in furtherance of its conspiracy, both within and prior to four years preceding the date of the filing of this Complaint. Such overt acts include the illegal meetings, communications, and misrepresentations regarding the fraudulent scheme described herein. Every act committed by McKesson in furtherance of its scheme is a new and separate violation and part of a continuing course of illegal conduct that operates to toll any applicable statutes of limitation.

## VI.    CLASS ACTION ALLEGATIONS

240.    Plaintiffs brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, as representatives of the following Class ("Class" or "Public Payor Class"):

> All governmental entities, agencies, and political subdivisions in the United States and its Territories, including the States, local governments, and Territories themselves, that paid for Marked-Up Drugs based on AWP from August 1, 2001, to the present and that used First DataBank or Medi-Span data in determining the AWP of

the Marked-Up Drugs. The Marked-Up Drugs are all drugs identified in Exhibit A and consist of brand-name drugs only.[184]

Excluded from the Class are: Defendant; Defendant's parents, subsidiaries, and affiliates; all governmental entities, agencies, and political subdivisions in the State of California; the State of Connecticut; and federal governmental entities.

241.    The Class consists of hundreds if not thousands of class members geographically dispersed throughout the United States including scores of State, county, and local governmental entities that provide self-insured prescription drug benefits for their employees. Joinder of all class members is impracticable. These class members may be identified from information and records maintained by Defendant or third-parties.

242.    Plaintiffs are members of the Class and Plaintiffs' claims are typical of those of the Class because all members of the Class were similarly affected by Defendant's wrongful conduct in violation of federal racketeering and state laws. All members of the Class were deprived of the benefits of accurate AWP data and lawful pricing for brand-name drugs as a result of Defendant's unlawful conduct.

243.    Plaintiffs, as representatives of all Class members, will fairly and adequately protect the interests of the Class. Plaintiffs have engaged counsel experienced and competent in class action and complex litigation, including litigation involving the healthcare industry. Plaintiffs' interests are consistent with, and not antagonistic to, those of the members of the Class. An effective and practicable manner of notice to such members of the Class can be fashioned by the Court.

---

[184] The exact identify of the drugs at issue in this lawsuit may be identified through records in the possession of Defendant. Based on information currently available, Exhibit A contains a list of such drugs.

244.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Such common questions of law and fact include:

a.    Whether AWPs published by First Data are used as a contractual benchmark for payments by Public Payors for drugs;

b.    Whether Defendant engaged in a conspiracy to fix or raise the WAC-to-AWP mark-up and the AWPs used by Plaintiffs and other members of the Class as the basis for reimbursement for the drugs that are the subject of this Complaint;

c.    Whether Defendant engaged in a course of conduct that improperly inflated the WAC-to-AWP mark-up and the AWPs used by Plaintiffs and other members of the Class as the basis for reimbursement for the drugs that are the subject of this Complaint;

d.    Whether Defendant engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiffs and other members of the Class;

e.    Whether Defendant formed an enterprise for the purpose of effectuating its fraudulent scheme;

f.    Whether Defendant used the U.S. mails and interstate wire facilities and commerce to carry out its fraudulent scheme;

g.    Whether Defendant engaged in conduct that violated the federal racketeering laws as alleged herein;

h.    Whether Plaintiffs and the other members of the Class were injured by the conduct of Defendant and, if so, the appropriate class-wide measure of damages; and

- 80 -

i.    Whether Plaintiffs and the other members of the Class are entitled to injunctive relief.

245.    Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant.

246.    Defendant has acted on grounds generally applicable to all Class members in that Defendant's anticompetitive and fraudulent actions uniformly impacted all Class members. Accordingly, injunctive relief is necessary to protect all Class members from further injury.

247.    Plaintiffs know of no difficulty that would prevent this case from being maintained as a class action.  Class action treatment is a superior method for the fair and efficient adjudication of this controversy.  Class action treatment will, among other things, allow a large number of similarly situated governmental entities to prosecute their common claims in a single forum, thus avoiding the unnecessary duplication of resources that numerous individual actions would require.  Moreover, class action treatment allows injured Public Payors, such as small towns or counties, to seek redress on claims that might be impracticable to pursue individually.

## VII.    CLAIMS FOR RELIEF

### COUNT I
### CIVIL RICO
### (18 U.S.C. § 1962(c))

**(On Behalf of Plaintiffs and the Class)**

248.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows.

249.    McKesson violated 18 U.S.C. § 1962(c) by associating with an enterprise that engaged in a pattern of racketeering activity.

250.    Plaintiffs, McKesson, and First DataBank are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

251.    At all relevant times, McKesson, along with its co-conspirator, First DataBank, conducted the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

## A.    McKesson and First Data Formed an Association-in-Fact RICO Enterprise

252.    For purposes of this claim, certain RICO "enterprises" are associations-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of (a) First Data and (b) McKesson, including their directors, employees and agents.  These associations-in-fact are sometimes collectively referred to herein as the "McKesson-First Data Enterprise."  The Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price information, which all too often includes disseminating false and misleading AWPs; (b) implementing the Scheme; (c) deriving increased profits from the activities of the Enterprise; and (d) perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry.  First Data and McKesson each had a common purpose of perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry and a common purpose in inflating the AWPs.

253.    McKesson initiated the Scheme and provided FDB with the information necessary to carry it out, including but not limited to, its proposed mark-up, current WACs, and its weekly FDB AWP comparison charts to chart the progress of the Scheme.  FDB published the inflated AWPs and kept up the ruse that the AWPs were the result of an objective survey process.  It coordinated with McKesson to disguise the Scheme, including but not limited to, claiming that the results of its alleged surveys could not be disclosed on the grounds that they contain

- 82 -

proprietary information and by falsely representing that the changes were attributable to government investigation of AWPs and generalized movements in the pharmaceutical industry as opposed to McKesson and FDB's collusion.

254.    The Enterprise functioned as a continuing unit as evidenced by the continuing coordination of activities between McKesson and First Data.  There is a common communication network by which McKesson and First Data shared and continued to share information on a regular basis for all times relevant to this lawsuit, including August 1, 2001, through March 15, 2005.  Typically this communication occurred by use of the wires and mails in which McKesson and First Data discuss and agree on the new WAC-AWP mark-up for a given drug.  McKesson and First Data functioned as a continuing unit for the purposes of implementing the Scheme. When issues arose during the Scheme each agreed to take actions to hide the Scheme and to continue its existence.

**B.     McKesson Associated with the Enterprise**

255.    Both First Data and McKesson were willing participants in the McKesson-First Data Enterprise; each had a common purpose and interest in the establishment and operations of the Scheme.  They also agreed to the manner in which the McKesson-First Data Enterprise would be conducted, *i.e.*, through McKesson's transmission of increased mark-ups and First Data's publication of those mark-ups.  This organizational structure was the basis on which the McKesson-First Data Enterprise operated.

256.    At all relevant times, First Data and McKesson were generally aware of each others' conduct in furtherance of the Scheme, were knowing and willing participants in that conduct; and incurred benefits as a result.  McKesson and First Data initiated the Scheme in 2001-2002 and continued the Scheme in force in 2003-2004.

- 83 -

257.     As the creator of the McKesson-First Data Enterprise and the principal architect of the plan to defraud, McKesson was keenly aware of the existence of the enterprise, its purpose and its activities.  McKesson has acknowledged that it inflated its mark-ups, beginning in 2000, in order to inflate AWPs.  McKesson also regularly discussed the Scheme with First Data in wires, e-mails, and in telephone conversations and monitored its progress, including through weekly AWP comparison reports.

258.     First Data was aware that McKesson's mark-ups were false and that its own published AWPs were inflated by the Scheme.  This awareness comes from the following sources:  First, McKesson informed First Data that it was artificially inflating the mark-ups to a uniform 25%.  Second, prior to the Scheme, First Data had in some instances obtained mark-ups from wholesalers, which made First Data aware, even in the absence of McKesson's direction communication, about the artificial nature of McKesson's pricing information and the inaccuracy of its reported AWPs.  Third, as various governmental entities reported on AWP inflation, First Data did not confirm the accuracy of the AWPs that First Data used.  Fourth, First Data stopped conducting even limited surveys of other wholesalers and simply accepted the Scheme, when it knew there was no basis for the 5% mark-up.  Fifth, First Data actually received letters from certain manufacturers stating that the 5% increase in AWP was not justified.

259.     The Scheme went to the point where FDB would query McKesson whether there had been a WAC increase so that a given drug could go to a 25% mark-up.  Thus, both McKesson and FDB conspired to implement the Scheme.[185]

---

[185] MCKAWP 0069553.

**C.    The Enterprise Affected Interstate Commerce**

260.    The McKesson-First Data enterprise affected interstate commerce because it increased AWPs, a nationally recognized benchmark for the purchase price of brand-name prescription drugs.  Pharmacies are reimbursed by health plans and other pharmacy benefit providers based on AWP.  Under this system, a higher WAC-to-AWP spread results in increased profits to pharmacies.  Thus, McKesson and First Data helped deliver greater profits to pharmacies nationwide by conspiring to increase AWPs.  And they caused consumers and TPPs to pay more.

261.    In the underlying litigation on behalf of private payors, McKesson's expert, Joseph Kalt, admitted that "McKesson's higher SSPs ("suggested sales prices") led to higher AWPs published by FDB."[186]

262.    This was also acknowledged in McKesson's internal mails, where McKesson's executives discussed the positive impact of "normalizing" on McKesson's customers:

> Here is an idea.  Two years later, ***and having had some recent success in raising AWP's,*** I think this could be presented to him positively in this way.
>
> Omnicare is looking for ...... say $500,000 in benefit from year end deals, even though this was not part of their contract.  We need to ask them to roll up ***or recalculate their reimbursements for last year based on the new AWP's with a 20% spread.  And......this is not just a one time benefit.  They will receive this now and each year going forward until they renegotiate contracts with third parties (and hopefully do not give up this gift).***
>
> ***Our successes recently and during this past year includes raising AWP spreads to 20% (markup of 25%) include Parke Davis (division of Pfizer).  Searle (division of Pharmacia). GlaxoSmithKline (Glaxo was at 16 2/3%).  AstraZeneca, TAP, Berlex,*** JOM including Alza and Centocor, parts of Merck and BMS where things were mixed between 16 2/3 and 20%, and more to come.  ***Some of our friends in retail that I have spoken with are pretty overwhelmed that we would be "driving" this process on their behalf.***  Of course, we are not solely responsible

---

[186] Report of Joseph Kalt (January 28, 2008) Report at 16.

for this "normalizing" of AWP's but we have done our part as I have discusses with your previously. I have had conversations with Albertsons and Safeway and a few others.

Remember, "McKesson is doing this to improve our efficiencies in our BIS group." With mixed AWP spreads, our BIS group is required to make manual overrides (for every pricing activity) to input the First Data Bank AWP whenever there is a difference from our Suggested Sell or List Price. It could be stated as a benefit of the Sixth Sigma method of identifying defects. An "unintended consequence" is that the profitability of our customers will be impacted in a appositive way. ***They will basically get 3 1/3% more profit on Rx's filled with this new AWP spread. (Just imagine what this would mean on drugs like Lipitor or Prilosec*....[187]**

263.    McKesson also realized that it could "'market' [its] efforts" by informing its customers that it was "doing everything possible to 'raise' AWP's when appropriate."[188] McKesson appreciated that if it failed to inform its customers that it was behind all these changes "it's possible that some of these accounts will believe that this stuff just happens and our efforts will go unrecognized."[189] As one McKesson executive put it: "This sounds like something we should at least [be] quietly communicating to our customers in order to get some mileage from it[.]"[190] And so it began:

[To Dan Connolly of Bartell Drugs]: Celexa and Lexapro will have an AWP markup of 25% or a spread of 20% as soon as FDB information is updated. Look for the change to happen next week. Keep smilin[g] . . . and who said we never listen to our customers (and old friends).[191]

[To Dan Connolly]: Just wanted you to know that Clarinex AWP spreads went to 20% this week. A few weeks ago Celxa went to 20% as well. Fat cat status is just around the corner.[192]

[To David Vucurevich of Rite Aid]: P.S. latest AWP changes . . . Celexa and Clarinex, working on Lilly and Novo.[193]

---

[187] MCKAWP 0065895 (emphasis added).

[188] MCKAWP 0065895.

[189] MCKAWP 0065895.

[190] MCKAWP 0069732.

[191] MCKAWP 0069817.

[192] MCKAWP 0069901.

264.    A field agent reports:  "Some of the more savvy stores like Med-X have taken

notice."[194]  Bob James realized that the goodwill McKesson established with the pharmacies as a

result of inflating AWPs would give it a substantial edge over its competition:

> In my discussions [with select customers about McKesson's efforts
> to "normalize" the AWP markup at 25%], one of the comments
> that was made was "this would certainly be a good reason to renew
> our agreement with McKesson when its time."  Talk about being
> good partners, wow!  This is worth further discussion as we go
> forward.  Maybe a proactive strategy like this will soften some of
> the activity around asking for lower costs and more benefit.[195]

265.    Bob James proposed disclosing McKesson's efforts to customer Omnicare who

purportedly was looking for an extra-contractual year-end bonus in the neighborhood of

$500,000:

> Omnicare is looking for . . . . . . say $500,000 in benefit from year
> end deals,  even though this was not part of their contract.  We
> need to ask them to roll up or recalculate their reimbursements for
> last year based on the new AWP's with a 20% spread.  And . . . . . .
> this is **not just a one time benefit**.  They will receive this now and
> for each year going forward until they renegotiate their contracts
> with third parties (and hopefully do not give up this gift).[196]

Bob James also noted with pleasure that Kay Morgan spoke "with Eric Sorkin at RiteAid to let

him know how much effort we are putting into this AWP thing to get it right."[197]  Other

customers were also appreciative.  For example an unnamed customer from Ohio, called

McKesson "to say that he was looking at some of these items again and found that the spread

appears to have increased significantly on most of these items to the area of 20-21%.  He

wondered if we had any part in doing this and, if so, he wanted to let us know that he really

---

[193] MCKAWP 0069911.

[194] MCKAWP 0069732.

[195] MCKAWP 0065895.

[196] MCKAWP 0065895 (boldface, ellipses in original).

[197] MCKAWP 0069669.

appreciated our efforts."[198]  Med-X Corp.'s Director of Operations, Jerry Howard reviewed the numbers, put two and two together,[199] and "was very ex[c]ited about" McKesson "working on AWP expansion."[200]

## D.    McKesson Conducted the Affairs of the Enterprise

266.    McKesson participated in the affairs of the McKesson-First Data Enterprise and not just its own affairs.  In its own words, McKesson described itself as the "driving" force behind the Scheme and acknowledged that, without its efforts, the Scheme never would have succeeded.[201]  It provided First Data with its mark-ups and product price increases to implement the increased mark-ups; ran weekly comparisons of its list prices and First Data's AWPs; worked with First Data to point out "problem suppliers;" and helped to conceal the Scheme.  Each of these actions was necessary to, or helpful in, the operation of the McKesson-First Data Enterprise to carry out its goal of disseminating false price information.

267.    McKesson has exerted control over the Enterprise, and, in violation of Section 1962(c) of RICO, McKesson has conducted or participated in the conduct of the affairs of those RICO enterprises, directly or indirectly, in the following ways:

a.    Both McKesson and First Data had a degree of control concerning the WAC-to-AWP mark-up and the AWPs that First Data reported;

b.    First Data has directly controlled the creation and distribution of marketing, sales, and other materials used to inform end payors as to the value of its services;

---

[198] MCKAWP 0069513.
[199] MCKAWP 0069732.
[200] MCKAWP 0069726.
[201] MCKAWP 0065895.

c.      McKesson intended that First Data would (and did) distribute its

publications containing false AWPs through the U.S. mails and by interstate wire

facilities; and

d.      First Data allowed McKesson to exert control over its organization,

knowing that the AWPs were inflated as a result of the Scheme and were not real

numbers.  McKesson controlled First Data by virtue of its ability to cause an increase in

the WAC-AWP mark-up.  First Data did so because the reporting of AWPs was, and is, a

major part of its business, and McKesson was integral to First Data's AWP reporting and

to increasing First Data's profits for the reasons set forth herein.

268.    The McKesson-First Data Enterprise had a hierarchical decision-making structure

headed by McKesson.  McKesson issued instructions on how the WAC-to-AWP mark-up was to

be reported and each Publisher accepted those instructions despite knowing of their falsity.

269.    In violation of Section 1962(c) of RICO, McKesson conducted the affairs of the

McKesson-First Data Enterprise with which it associated by fraudulently increasing certain

AWPs by 5% that First Data then published and disseminated nationwide.

**E.      The Enterprise Engaged in a Pattern of Racketeering Activity, Consisting of Mail or
         Wire Fraud Violations**

270.    The Scheme consisted of a pattern of uniformly raising mark-ups on roughly 400

brand drugs to 25% carried out over a three-and-a-half-year period.  The alteration of the mark-

up for these drugs was carried out through the McKesson-First Data Enterprise.  McKesson used

its position to provide First Data with false mark-up information and to monitor First Data's

progress in the dissemination of false prices, as well as to capitalize on the benefits of this

Scheme by boasting to select retailers of its role in the AWP increases.

271.    The nature and pervasiveness of the Scheme, which was orchestrated out of the corporate headquarters of McKesson and First Data, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities.

272.    McKesson and its co-conspirator's racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and other end payors.  Each separate use of the U.S. mails and/or interstate wire facilities employed by the co-conspirators was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs. McKesson and First Data have each engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular McKesson-First Data Enterprise.

273.    Both McKesson and its co-conspirator, First Data, conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  This pattern of racketeering likely involved thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their Scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which McKesson intended to defraud Plaintiffs and other intended victims.

274.    Many of the precise dates of McKesson's and First DataBank's uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to their books and records.

Indeed, an essential part of the successful operation of the Scheme alleged herein depended upon secrecy, however, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the Scheme.  Plaintiffs describe this as follows.

**1.     The McKesson-FirstDataBank Enterprise engaged in a Scheme to defraud Public Payors**

275.     McKesson's pattern of racketeering activity includes acts indictable as mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.  McKesson's fraudulent Scheme consisted of, *inter alia*:  deliberately causing falsely inflated AWPs to be published or disseminated so that Plaintiffs and other end payors would pay excess charges for the drugs that are the subject of this lawsuit.

**2.     McKesson specifically intended to defraud Public Payors**

276.     McKesson's own documents, as well as the testimony of its officers, reveal that it intended to defraud end payors by raising AWPs; that it maintained the inflated mark-ups in its system for this purpose; and that it worked closely with First Data to increase brand AWPs over time.  By contrast, McKesson's competitors, ABC and Cardinal, refused to change the manufacturers' historic mark-ups even though they were pressured by retailers to do so, and even refused to take part in any First Data survey out of concern that they might be perceived as setting AWPs.

**3.     The Enterprise made use of the U.S. mails and interstate communications in furtherance of this Scheme**

277.     McKesson and First DataBank's use of the U.S. mails and interstate wire facilities to perpetrate the 5% Scheme involved thousands of communications throughout the time period including August 1, 2001 through March 15, 2005, including, *inter alia*:

- 91 -

a.    Marketing materials about First Data's services, which First Data, sent to health care providers located across the country;

b.    Written representations and telephone calls between McKesson and First Data regarding mark-ups and AWPs, which occurred on a regular basis each year;

c.    Hundreds of e-mails between McKesson and First Data agreeing to, or effectuating the implementation of, the Scheme. These e-mails included, but are not limited to, the e-mails identified earlier in this Complaint;

d.    Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

e.    Receipts of increased profits – the wrongful proceeds of the Scheme – sent through the U.S. mails and interstate wire facilities; and

f.    In addition to the above-referenced RICO predicate acts, it was foreseeable to McKesson that First Data would distribute publications containing false AWPs through the U.S. mails and by interstate wire facilities. Further, McKesson has, in furtherance of the Scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions. These uses of the U.S. mails include some of the documents referenced in this Complaint.

278.    These communications by U.S. mail or wire were made for the purpose of carrying out the Scheme or hiding it from Plaintiffs and other end payors. The McKesson-First Data Enterprise exchanged scores of e-mails and numerous telephone calls, in which the co-conspirators discussed their plan to "normalize" AWPs at 25%, as well as communications

- 92 -

targeting individual manufacturers, PBMs and other members of the pharmaceutical industry

with false information intended to hide the Scheme.  Additionally, McKesson communicated by

e-mail and telephone many times with select retail customers to brag about the effects of the

Scheme.  McKesson also used e-mail to caution its employees about discussing the Scheme.

First Data made false statements in numerous individual e-mails and telephone communications

and in public statements on its website about its process of determining AWPs.  First Data also

used e-mail to caution McKesson against raising AWPs unless the manufacturer announced a

price change.

**F.    Plaintiffs Relied on the Accuracy of the Falsely Inflated AWPs Published by First Data or Medi-Span**

279.    In implementing its fraudulent Scheme, McKesson was acutely aware that

Plaintiffs and other end payors relied on the AWPs published by First Data and Medi-Span as a

pricing benchmark.

280.    The AWP-based reimbursement benchmark for payments in the retail class of

pharmaceutical trade has long been acknowledged.  The two largest public purchaser programs

for prescription pharmaceuticals – Medicaid and Medicare – historically relied upon published

average wholesale prices as the fundamental basis upon which to reimburse for branded drug

ingredient costs incurred by dispensers (retail pharmacies for Medicaid, and medical providers in

the Medicare arena).  Those paying for drugs, by statute or contract, rely on and use the

published AWP.

281.    At all times relevant to this lawsuit First Data and McKesson knew that

governmental and public payors such as Plaintiffs utilize AWP as a pricing benchmark.

McKesson was not only aware that First Data was the premier industry source for AWP

information but also that First Data supplied its pricing information to Medi-Span, thus, as

McKesson acknowledged, "[t]his means that Medi-Span data is the First DataBank data." McKesson engaged in a fraudulent scheme with First Data, knowing that First Data was in the best position to cause industry-wide changes to the AWPs and that First Data's purported method of calculating AWPs would both appear to legitimize the increases and keep McKesson's pivotal role in the Scheme a secret.

282.    Once McKesson and First Data raised the WAC-to-AWP mark-up to 25% on a given drug that mark-up remained in place and still remains in place to this day and thus continues to injure those entities such as Plaintiffs that rely on AWP as a pricing standard.

## G.    Damages Caused by McKesson's Scheme

283.    Plaintiffs have been injured in their business and property by reason of these violations in that they have made millions of dollars in overpayments they would not have made had McKesson not engaged in its pattern of racketeering activity.  McKesson's violations of federal law and its pattern of racketeering activity has directly and proximately injured Plaintiffs because they have paid many millions of dollars in inflated reimbursements or other payments for drugs whose AWP was artificially raised as described herein.

284.    McKesson and its co-conspirator, First Data, sent AWP information through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their Scheme.  Plaintiffs have made inflated payments for drugs based on, or in reliance on, reported and false AWPs.

285.    Under the provisions of Section 1964(c) of RICO, McKesson is jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II
## RICO CONSPIRACY
## (18 U.S.C. § 1962(d))
## (On Behalf of Plaintiffs and the Class)

286.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows.

287.    McKesson violated 18 USC § 1962(d) by conspiring to associate with a racketeering enterprise, in violation of 18 U.S.C. § 1962(c).  McKesson knowingly joined First Data in a conspiracy to manipulate AWPs in violation of § 1962(c).

**A.    McKesson Knew and Adopted the Illegal Purpose of the Enterprise**

288.    That McKesson knew and adopted the illegal purpose of the Enterprise is evident from its own documents and the testimony of its officers.  McKesson's internal communications speak of an express illegal agreement between McKesson and First Data to raise mark-ups on all new drugs as well as other subject drugs.  These documents also reveal that McKesson frankly disclosed to First Data its plan to standardize mark-ups for brand drugs and that it worked closely together with First Data to implement this plan, supporting an inference of an implicit agreement to create a uniform mark-up for all brand drugs.  McKesson's officers have also testified that McKesson artificially raised the mark-ups on its suggested retail prices and provided these false numbers to First DataBank.

289.    Additionally, McKesson's conduct in sending e-mails and other communications to FDB to direct the normalization plan, FDB's conduct publishing AWPs inflated by the uniform 25% mark-up and in sending communications acknowledging that its raised AWPs on some of the NDCs and had yet to make additional changes to NDCs to be consistent with the overall Scheme, as well as e-mails from McKesson bragging about its ability to work with FDB

to carry out the normalization plan is consistent with the existence of an agreement to carry out the Scheme.

**B.        McKesson Engaged in Activities to Further the Goals of the Enterprise**

290.    McKesson actively furthered the goals of the McKesson-First Data Enterprise to defraud end payors.  It changed its internal mark-ups on brand drugs with the intention that the changes would affect published AWPs for brand drugs; engaged in frequent discussions with First Data about its plan to raise AWP/WAC mark-ups in the marketplace; made several requests that First Data change the mark-up on various brand name drugs without any mention by either First Data or McKesson of a survey; compiled weekly First Data AWP comparison reports to point out the "problem suppliers" to First Data; discretely boasted about the effects of the Scheme to select customers in order to garner goodwill and improve customer relationships; and maintained the secrecy of the Scheme.

**C.        Damages Caused by McKesson's Scheme**

291.    Plaintiffs have been injured in their business and property by reason of these violations in that they have made millions of dollars in overpayments they would not have made had McKesson not engaged in its pattern of racketeering activity.

**D.        McKesson is Jointly and Severally Liable for the Conduct of the Enterprise**

292.    As co-conspirator, McKesson is jointly and severally liable for all damage that occurred as a result of both its actions and that of First Data's in furtherance of the conspiracy to raise AWPs.  Even if McKesson was not specifically told that FDB had stopped conducting AWP surveys when it did, this step was a logical consequence of the McKesson-First Data Enterprise's goal of changing brand drugs to a single mark-up.  McKesson is liable for all damages arising from First Data's discontinuation of the survey process in furtherance of the Scheme.

293.    Under the provisions of Section 1964(c) of RICO, McKesson is jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT III
## VIOLATIONS OF UNFAIR AND DECEPTIVE TRADE PRACTICE LAWS
### (On Behalf of Plaintiffs and the Class)

294.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

295.    As described herein, Defendant has intentionally and repeatedly used deception, fraud, false pretense, false promise, misrepresentation, and/or concealment, suppression or omission of material facts in connection with the sale or advertisement of brand-name prescription drugs and electronic drug data pricing information.  Defendant intended for Public Payors and others to rely on its concealment, suppression, and/or omissions.

296.    Defendant's actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of various state unfair and deceptive trade practices statutes.  Specifically, as alleged herein, Defendant has violated the following State laws:

        a.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

        b.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*, including 4-88-113(f), and 4-8-102(5);

c.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*, including § 6-1-113(1)(c) and § 6-1-102(b);

d.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*, including § 42-110(a)(3);

e.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*, including 6 Del. Code § 2512;

f.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*, including § 28-390(1);

g.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

h.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*, including § 481A-2;

i.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*, including § 48-602;

j.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*;

k.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

l.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

m.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*, including § 13-101(h);

- 98 -

n.        Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code Ann. § 30-14-101, *et seq.*

o.        Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, including § 59-160(1);

p.        Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

q.        Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, including § 358A:1(1);

r.        Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*, § 56:8-1(d);

s.        Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

t.        Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

u.        Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

v.        Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.,* including § 51-15-01(4);

w.        Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.,* including § 1345.01(B);

x.        Defendant has engaged in unfair competition or unfair or deceptive acts or practices or made representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

y.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.,* including § 201-2(2);

z.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.,* including § 6-13.1(3);

aa.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.,* including § 39-5-10(9);

bb.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.,* including § 37-24-1(8);

cc.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.;*

dd.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 245 1, *et seq.;*

ee.    Defendant has engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.,* including § 19.86.010(1);

ff.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.;* and

gg.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*

297.    At the appropriate time, Plaintiffs will articulate the proper approach for certification of the above claims.  This may include the use of a common jury instruction or the grouping of State laws as set forth in *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83 (D. Mass. 2008).

298.    Plaintiffs have provided or will provide notice of this litigation to each Attorney General in each of the States requiring such notice.

**COUNT IV**
**CIVIL CONSPIRACY**
**(On Behalf of Plaintiffs and the Class)**

299.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

300.    This Count is asserted in the alternative on behalf of Plaintiffs and respective State sub-Classes consisting of all governmental entities, agencies, and political subdivisions in each of the fifty States that paid for Marked Up Drugs based on AWP from August 1, 2001 to the present and that used First Data or Medi-Span data in determining the AWP of the Marked Up Drugs.  The Marked Up Drugs for these sub-Classes are all drugs identified in Exhibit A and consist of brand-name drugs only.  Excluded from the sub-Classes are:  Defendant; Defendant's parents, subsidiaries, and affiliates; all governmental entities, agencies and political subdivisions in the State of California; the State of Connecticut; and federal governmental entities.

301.    This Count is asserted based upon either the law of the State of California or the common law of civil conspiracy in the fifty States.  The law of the State of California should apply because both conspirators are located there and the acts underlying the conspiracy occurred there.

302.    At the appropriate time, Plaintiffs will articulate the proper approach for certification of the above claims.  This may include the use of a common jury instruction or the grouping of State laws as set forth in *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83 (D. Mass. 2008).

001821-16 288655 V1

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT
### (On Behalf of Plaintiffs and the Proposed Class)

303.    The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Class.

304.    Plaintiffs and members of the Class entered into contracts to pay for prescription drugs based on AWP, including for the drugs identified in Appendix A of this Complaint.

305.    McKesson was aware of the fact that Public Payors, including Plaintiffs and members of the Class, paid for prescription drugs based upon AWP minus a discount.

306.    McKesson was aware that the effect of the Scheme was to make Plaintiffs' and Class Members' performance of their contracts to pay for prescription drugs based on AWP more costly.  Indeed, McKesson saw as a benefit of the Scheme making Plaintiffs' and Class Members' performance more costly in order to benefit McKesson's retail clients.  McKesson intentionally and improperly interfered with Plaintiffs' and Class Members' performance of their contracts by increasing reimbursement costs.

307.    This Count is asserted based upon either the law of the State of California or the common law of tortuous interference in the fifty States.  The law of the State of California should apply because both McKesson's acts of interference occurred there.

308.    At the appropriate time, Plaintiffs will articulate the proper approach for certification of the above claims.  This may include the use of a common jury instruction or the grouping of State laws as set forth in *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83 (D. Mass. 2008).

309.    As a direct and foreseeable result of Defendant's tortious interference Plaintiffs and members of the Class have been damaged.

001821-16 288655 V1

**COUNT VI**
**USE OF DECEPTIVE TRADE PRACTICES IN VIOLATION**
**OF THE OKLAHOMA CONSUMER PROTECTION ACT**
**(15 OKL. ST. § 751, *et seq*.)**
**(On Behalf of Plaintiff the State of Oklahoma)**

310.    This count is brought on behalf of the State of Oklahoma for damages to
SoonerCare and the Group Insurance Board.  Plaintiff State of Oklahoma incorporates by
reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

311.    In connection with consumer transactions, McKesson has engaged in, and
continues to engage in, consumer fraud, unlawful trade practices, unfair trade practices, and
deceptive trade practices in violation of 15 Okl. St., § 751, *et seq*., as amended.  Specifically, and
without limitation, McKesson:

a.    knowingly or with reason to know, has made, and continues to make, false
representations regarding its role in the conspiracy described herein and accurate AWP
information for affected prescription drugs;

b.    before, during, and after consumer transactions, has made, and continues
to make, misrepresentations and omissions and has engaged, and continues to engage, in
deceptive trade practices that have deceived or misled, or could have reasonably be
expected to deceive or mislead, the State regarding McKesson's role in the conspiracy
described herein and accurate AWP information for affected prescription drugs to the
State's detriment; and

c.    has engaged in, and continues to engage in, unfair trade practices that are
immoral, unethical, oppressive, unscrupulous, or substantially injurious to aggrieved
consumers such as the State, including misrepresenting, failing to state, concealing,
suppressing and/or omitting facts regarding the conspiracy described herein and accurate
AWP information for affected prescription drugs.

- 103 -

312.    These acts and practices constitute violations of the Oklahoma Consumer Protection Act.

313.    Because of these violations and McKesson's involvement in the scheme alleged herein, the State and Oklahoma consumers have overpaid for affected prescription drugs.

314.    As a result of McKesson's unconscionable conduct, SoonerCare and the Group Insurance Board suffered and will continue to suffer substantial injuries and damages for which they are entitled to relief.  In addition to these damages, the State is also entitled to civil penalties, expenses, attorney's fees, and investigation fees for each violation of the Oklahoma Consumer Protection Act pursuant to 15 Okl. St. § 761.1.  The State is also entitled to punitive damages as McKesson's role in the conspiracy alleged herein was done intentionally and with malice toward others and/or with reckless disregard for the rights of others.

## COUNT VII
## VIOLATION OF OKLAHOMA MEDICAID FALSE CLAIMS ACT
### (63 OKL. ST. § 5053, *et seq.*)
### (On Behalf of Plaintiff the State of Oklahoma)

315.    This count is brought on behalf of the State of Oklahoma for damages to SoonerCare.  Plaintiff Oklahoma incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

316.    At all relevant times, McKesson "knowingly" (as defined in 63 Okl. St. § 5053.1): (1) caused to be presented to officers and/or employees of the State false claims for payment or approval, in the form of the false price information for the brand-name drugs discussed herein; (2) made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid for approved by the State, in the form of the false price information for the drugs discussed herein; and/or (3) conspired to defraud the State by getting a false or fraudulent claim allowed or paid, by engaging in the fraudulent acts with First Data as alleged herein.

317.    As a result, the State paid out as reimbursements to SoonerCare and Group

Insurance Board providers of the specified prescription drugs, sums of money grossly in excess

of the amounts contemplated by law, resulting in great financial loss to the State.  Such inflated

reimbursements have occurred throughout the time period at issue.  Moreover, since

November 1, 2007, and continuing to the present, McKesson has violated the Oklahoma

Medicaid False Claims Act by causing false claims for prescription drugs to be paid and

otherwise failing to acknowledge and take responsibility for the effects of the conspiracy

described herein.

318.    As a result of McKesson's conduct in violation of the Oklahoma Medicaid False

Claims Act, the State has suffered and will continue to suffer substantial injuries and damages

for which it is entitled to relief, including but not limited to three times the amount of damages

sustained by SoonerCare and civil penalties for each violation of the Act.

**COUNT VIII**
**DECEPTIVE TRADE PRACTICES**
**(VIOLATIONS OF MONT. CODE ANN. §§ 30-14-101-1414)**
**(On Behalf of Plaintiff the State of Montana)**

319.    The State of Montana repeats and realleges the preceding paragraphs of this

Second Amended Complaint as if fully set forth herein.

320.    This Claim is brought for restitution of the losses suffered by Montana Medicaid

as a result of the Scheme to recover civil penalties for defendant's violations of Montana law,

and to impose injunctive relief ending the unlawful schemes.

321.    Defendant's conduct as alleged in this Second Amended Complaint constitutes

deceptive acts or practices in violation of Mont. Code Ann. § 30-14-103 in that Defendant:

    a.    Has caused to be published AWPs that are inflated;

- 105 -

b.      Has failed to disclose material facts in the conduct of trade or commerce

in that it has not disclosed that the AWPs were marked up by the Scheme, and were

instead inflated in order to drive up the prices paid by Montana Medicaid; and

c.      Has made false or misleading statements of facts concerning the price of

goods in that it has lied about the true AWP in order to drive up the prices paid by

Montana Medicaid.

322.    Defendant knew or should have known that the actions set forth above violated

the Consumer Protection Act.

323.    The wrongful conduct alleged occurs and continues to occur in the ordinary

course of Defendant's business or occupation and has caused great harm to the State of Montana

and its residents.

324.    Defendant's violations of the law were committed with the intent to mislead and

defraud.

325.    Defendant's wrongful, deceptive and illegal conduct has resulted in excessive and

illegal profits to defendant and excessive payments by the State of Montana and its residents.

## COUNT IX
## MEDICAID FRAUD
## (VIOLATIONS OF MONT. CODE ANN. § 53-6-160)
### (On Behalf of Plaintiff the State of Montana)

326.    The State of Montana incorporates by reference all preceding paragraphs as if set

forth herein.

327.    This Claim is brought for Medicaid cost recovery pursuant to Mont. Code Ann.

§§ 53-6-143(4), 160.

328.    In the course of its business, McKesson caused to be published and/or republished

AWPs, and as a direct result caused false claims to be presented to the State.

- 106 -

329.    McKesson thereby violated Mont. Code Ann. § 53-6-160(1) in that it submitted untrue, incomplete, inaccurate and misleading information used to determine the amount of payment under the Medicaid program.  Defendant made or caused claims to be made knowing the claims to be rendered false, in whole or in part, by falsely reporting the AWP.

330.    McKesson also violated Mont. Code Ann. § 53-6-160(1) in that it made false statements by reporting inflated AWPs that exceeded the average of wholesale prices, based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to it in conducting its ordinary business affairs.  In making these false representations, it knew that others, including providers, hospitals, pharmacies and other providers, would use the inflated AWPs to obtain reimbursement from the Montana Medicaid Program.

331.    Defendant knew, or by virtue of its position, authority or responsibility should have known, of the falsity of the claim, statement or representation.

332.    As a result of defendant's violations of Mont. Code Ann. § 53-6-160, the Montana Medicaid Program made substantially higher reimbursements for affected drugs than it otherwise would have.

### COUNT X
### PUNITIVE DAMAGES
**(On Behalf of Plaintiff the State of Montana)**

333.    The State of Montana realleges and incorporates the previous paragraphs of this Complaint as though fully set forth herein.

334.    As detailed in this Second Amended Complaint, defendant has engaged in actual fraud and has acted with actual malice.

335.    Defendant has made false representations with knowledge of their falsity, has concealed material facts with the purpose of depriving the Montana Medicaid monies, and the

- 107 -

State has rightfully relied upon such misrepresentations and injury has resulted as a result of such reliance.

336.    Defendant also had knowledge of facts or intentionally disregarded facts that created a high probability of injury to the State and Medicaid participants, and deliberately proceeded to act in conscious or intentional disregard of, or with indifference to, the high probability of this injury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the other members of the Class, respectfully pray:

A.    that the Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action be given to the Class;

B.    that the acts alleged herein be adjudged and decreed to be unlawful in violation of the federal racketeering laws and State statutory and common law;

C.    that Plaintiffs and the Class recover three-fold the damages determined to have been sustained by them pursuant to 18 U.S.C. § 1964(c) and all measures of damages allowable under the State statutes identified herein and the common  law, and that judgment be entered against Defendant in favor of the Class;

D.    that Plaintiffs and the Class recover the costs and expenses of suit, pre- and post-judgment interest, and reasonable attorney fees as provided by law;

E.    that Defendant be enjoined from continuing or resuming its unlawful acts discussed above;

F.    that Defendant be ordered to pay restitution to Plaintiffs and the Class;

001821-16 288655 V1

G.     that Defendant be ordered to pay civil penalties for violations of applicable State

statutes;

H.     that Plaintiffs and the Class be granted such other, further relief as may be

determined to be just, equitable and proper by this Court, including but not limited to punitive

damages; and

I.     that the Court order such other and further relief as the Court deems just,

necessary and appropriate.

DATED this 3rd day of March, 2009.

Respectfully submitted,

By    s/James L. Ward
         James L. Ward, Jr.
         A. Hoyt Rowell, III
**Richardson, Patrick, Westbrook & Brickman, LLC**
P.O. Box 1007
Mt. Pleasant, SC 29465
843-727-6500 (tel.)
843-216-6509 (fax)

*Attorneys for The Board of Commissioners of Douglas
County, Kansas; The State of Oklahoma; Baltimore,
Maryland; City of Panama City, Florida; Anoka County,
Minnesota; Columbia, South Carolina; Goldsboro, North
Carolina; and the Proposed Class*

By    s/Steve W. Berman
         Steve W. Berman
         Sean R. Matt
         Barbara A. Mahoney
**Hagens Berman Sobol Shapiro, LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
206-623-7292 (tel.)
206-623-0594 (fax)

*Attorneys for The State of Montana and the Proposed Class*

R. Bryant McCulley
**McCulley McCluer PLLC**
One Independent Drive, Suite 3201
Jacksonville, FL 32202
904-482-4073 (tel.)
904-354-4813 (fax)

Stuart H. McCluer
**McCulley McCluer PLLC**
1109 Van Buren Avenue
Oxford, MS 38655
662-236-1401 (tel.)
662-234-1974 (fax)

Daniel Kotchen
Daniel Low
**Kotchen & Low LLP**
2300 M St., NW, Suite 800
Washington, DC 20037
202-416-1848 (tel.)
202-280-1128 (fax)

*Attorneys for The Board of Commissioners of Douglas
County, Kansas; The State of Oklahoma; Baltimore,
Maryland; City of Panama City, Florida; Anoka County,
Minnesota; Columbia, South Carolina; Goldsboro, North
Carolina; and the Proposed Class*

- 110 -

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on March 3, 2009.


                                            s/ Steve W. Berman
                                            Steve W. Berman

001821-16  288655 V1